GROSS, J.
This appeal stems from an order of the trial court resentencing appellant Keith Peters to 99 years in prison for the numerous felonies he committed during a crime spree. Because of an anomaly that arose from the application of 1989 statutes after the decision in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), we reverse the sentence and remand for resentencing.

*837
The Charges

In November 1989, following a crime spree at the age of sixteen, Peters was charged as an adult in St. Lucie County with six counts of armed robbery, one count of attempted armed robbery as a principal, and two counts of grand theft auto. All of the offenses were alleged to have occurred prior to October 13, 1989, and all but one of the armed robbery counts included a twenty-two-year-old co-defendant, Robert Miller.

Indian River County Charges

In addition to the St. Lucie cases, Peters was also charged with felonies in two Indian River County cases, both of which were alleged to have occurred after October 13, 1989. Peters later pled no contest in one case on December 28, 1990, and was sentenced to 4½ years in prison. On July 8, 1991, Peters pled no contest to the second charge, receiving an additional sentence of 5½ years imprisonment.

1991 Sentencing

After being sentenced in the Indian River cases, Peters entered an open plea of no contest in September 1991 to each count in his St. Lucie County cases. At the time, the sentencing guideline scoresheet prepared by the State included his Indian River convictions as “prior record” and reflected a “recommended” sentence of twenty-seven to forty years in prison, with a “permitted” sentence of twenty-two years to life.
Following a hearing, Judge Walsh sentenced Peters to life in prison on two of the armed robbery charges; consecutive terms of 99 years in prison on the remaining armed robbery counts, each with a three-year minimum mandatory sentence; a consecutive term of fifteen years in prison for attempted robbery; and consecutive terms of five years in prison for each grand theft charge. In imposing this lengthy sentence, Judge Walsh expressed his intention that Peters never be released from prison, regardless of Florida’s gain time provisions, stating:
I have given you, sir, a life sentence and a 99 year sentence so no matter how much the legislature screws up your gain time in the future — life right now means life and in the event everything else goes wrong and life still remains the same, then you will be incarcerated for the rest of your life.
It is the court’s intention to assure that you are never released from the prison system. That is why I have given consecutive yearly sentences. Even if they start giving gain time down to 90 percent of the sentence, it is the court’s intention to assure the protection of the public to make sure you never get out of jail.
Shortly after sentencing, Peters successfully challenged his sentence on the grounds that Judge Walsh had been unaware that he was a juvenile when he committed the offenses. Following an additional hearing, Judge Walsh determined that a youthful offender sentence was inappropriate and re-imposed his previous sentences.
In a separate proceeding, Peters’ co-defendant from all but one of the armed robberies was sentenced to thirty years imprisonment.

2011 Resentencing

In October 2009, Peters filed a motion to correct illegal sentence and an emergency petition for writ of habeas corpus, stating as grounds that the scoresheet used by Judge Walsh impermissibly factored in his “out-of-sequence” Indian River County offenses as “prior record,” even though those offenses occurred after he committed the crimes alleged in his six St. Lucie *838 County cases.[1] The trial court agreed and granted the motion, returning the case to Judge Walsh for resentencing. However, since the Public Defender was appointed to represent Peters, and since Judge Walsh was a relative of the circuit’s elected Public Defender, Judge Walsh recused himself, resulting in another reassignment to Judge James McCann.
Prior to the sentencing hearing, the State submitted a written memorandum, in which it contended that the trial court should upwardly “depart from the sentencing guidelines by scoring [Peters’] otherwise nonscoreable ‘out of sequence’ convictions” as “prior record.” In addition, the State argued that although, pursuant to the United States Supreme Court’s decision in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), the trial court could not impose a life sentence without the possibility of parole, it could sentence Peters to multiple, concurrent terms of ninety-nine years in prison.
At the outset of the sentencing hearing, Judge McCann informed the parties that he had “reviewed the prior record,” including the accompanying scoresheets, arrest affidavits, informations, and final judgments. In addition, Judge McCann announced that, “taking into account not only the numerosity but the severity of the offenses,” he would impose an upward departure sentence to the extent Peters’ Indian River County convictions could be treated as “prior record.”

The State’s Case

Following the trial court’s initial ruling, the State called Deloye Henry, an assistant bureau chief with the Florida Department of Corrections, to describe the gain time Peters could receive from a term prison sentence. Henry explained that since Peters’ offenses occurred prior to 1993,[2] he would be subject to basic, statutory gain time, allotting him an automatic lump sum gain time along with the possibility of incentive gain time. As to the twenty years Peters had already served, Henry testified that Peters had been awarded 3,630 days of incentive time, while only losing 390 days. As a result, Henry opined that if Peters was sentenced to 99 years and acted perfectly, he would be eligible for release on February 1, 2034, at the age of 61. If Peters was, on the other hand, to receive only basic gain time, he would still be eligible for release on July 3, 2049, at 76 years of age.

The Defense’s Case

Defense counsel called Peters’ mother and brother, both of whom testified that Peters had changed his life for the better and learned from his mistakes.
In his defense, Peters testified that although he initially entered prison with a bad attitude, he has since realized the error of his ways, and has managed to stay positive despite his sentence by reading in the law library. This transformation, in Peters’ opinion, was exemplified by his disciplinary report (DR) records; of the nine DRs he received during his 20 year prison stay, only three had occurred within the past 17 years. Peters admitted that over the same time he received several correction consultations (CCs), but he explained that those infractions were less serious and involved innocuous actions such as sleeping in class.
*839 On cross examination, the prosecutor questioned Peters regarding a 2002 criminal case out of Volusia County where Peters was charged with tampering with a witness in his brother’s murder trial. Peters did not deny threatening the witness, but contended that he had been rehabilitated since the incident.
When asked about the six St. Lucie County robberies, Peters testified that he never carried a firearm, that he was merely a principal, and that his co-defendant was the more violent actor. Peters acknowledged that he knew his co-defendant had shot a victim as they fled one of the robberies, although he could not remember the specifics since the incident had occurred twenty years before. The prosecutor challenged Peters’ claim of being a mere “principal,” stating that in one of the police reports the victim identified him as the person who had held a gun to his head and threatened to kill him. Peters persisted in denying his direct involvement, stating again that he “never carried a firearm” and “was a principal.”
In addition, the prosecutor confronted Peters about two separate cases, 90-1066 and 91-342, neither of which was before the trial court in the initial 1991 sentencing. As to 91-342, a second-degree murder charge, Peters denied involvement, pointing to the fact that the case resulted in a nolle prosse. In 90-1066, it was alleged that, during a robbery, Peters and his codefendant kidnapped a woman from a car wash and sexually battered her. Peters admitted that he pled to the lesser included offense of attempted lewd act in the presence of a child, but disclaimed direct participation, explaining that he was a principal in a separate car and that DNA had absolved him; the prosecutor, however, rebuffed Peters’ account, stating that the DNA had only returned inconclusive.

Final Argument and Sentence

In closing, the State argued that Peters had failed to demonstrate his rehabilitation given his demeanor and behavior on the stand. Specifically, the State contended that Peters lied on the stand about possessing a firearm and other offenses — referring to a presentence investigation and arrest affidavit that conflicted with Peters’ testimony. Given these conflicts, the State implored the court, in the wake of the Graham decision, to enter a sentence which would send a message to other juveniles, stating, “There’s got to be some recognition by the overall community that there’s going to be punishment; hence the deterrence effect and, again, another basis for the State’s argument.” Furthermore, the State urged the court to rely on Judge Walsh’s findings by sentencing Peters to 99 years in prison, since such a sentence would provide “a meaningful opportunity to have release by demonstrating maturity and rehabilitation.”
In response, defense counsel urged the court not to blindly follow Judge Walsh’s previous conclusions, since his findings were taken in conjunction with an incorrect scoresheet. Defense counsel argued that it would be unfair to impose a 99 year sentence since Peters’ co-defendant, an adult at the time of the offenses and the more culpable of the two, was sentenced to only thirty years imprisonment.
After considering the arguments, Judge McCann reiterated his previous ruling that “given the numerosity and severity and high level of violence in the crimes that [Peters wa]s being sentenced for,” he would consider Peters’ out-of-sequence offenses “as grounds for departure.” Judge McCann disagreed with defense counsel’s “arguments about rehabilitation,” finding instead that Peters “didn’t take responsibility whatsoever” as evidenced by the factual discrepancies between Peters’ testi *840 mony and the accounts of witnesses in the police reports. In addition, Judge McCann expressed concern regarding Peters’ plea to a lesser included offense in 90-1066 and the circumstances leading to the State’s entrance of a nolle prosse in his second degree murder charge, stating that “those were the two worst crimes of his crime spree and those were the crimes that he has paid the least for.”
Judge McCann sentenced Peters to concurrent 99 year prison terms on each armed robbery count, with a three-year minimum for four of them. As to the remaining charges, Judge McCann re-imposed the previous sentences. In all, Peters was awarded 283 days time served and all sentences were imposed nunc pro tunc to October 4,1991, such that he maintained all unforfeited gain time.

I

Peters contends that he was denied an independent sentencing hearing by a neutral magistrate since Judge McCann, at the urging of the State, impermissibly abdicated his responsibilities by conforming his sentence to Judge Walsh’s previous findings.
Where resentencing is deemed appropriate, a criminal defendant is “entitled to a de novo sentencing hearing with the full array of due process rights.” St. Lawrence v. State, 785 So.2d 728, 729-30 (Fla. 5th DCA 2001) (citations omitted). A successor judge who was not a part of the previous proceedings may not, upon resen-tencing, base a sentence “ ‘entirely upon the recommendation of the [previous] trial judge.’ ” Spencer v. State, 611 So.2d 16, 17 (Fla. 3d DCA 1992) (quoting Moore v. State, 378 So.2d 792, 793 (Fla. 2d DCA 1979)). Rather, as prescribed by Florida Rule of Criminal Procedure 3.700(c)(1),[3] the successor sentencing judge must “acquaint[] himself [or herself ]with what transpired at the trial” before passing judgment. Moore v. State, 378 So.2d 792, 793 (Fla. 2d DCA 1979). In other words, “[w]hat is essential is for the successor judge to be sufficiently familiar with the case so that the imposition of a sentence is his or her act of independent judgment, not mere reliance on the decision of the original judge.” Ross v. State, 958 So.2d 442, 443 (Fla. 4th DCA 2007).
Where the record demonstrates that the successor judge “took considerable time with th[e] case prior to resentenc-ing, and ... was thoroughly familiar with the background and circumstances,” the resulting sentence will generally be upheld as independently formulated. Franquiz v. State, 724 So.2d 128, 129 (Fla. 3d DCA 1998); Davis v. State, 677 So.2d 1366, 1368 (Fla. 4th DCA 1996) (successor judge “acquired the degree of familiarity with the case that is required by the rule” by “reviewing] the predisposition report, hearing] testimony from a counselor ..., and considering] other arguments made by both sides”). By contrast, reversal is warranted where the successor judge either fails to familiarize himself or herself with the case or completely abdicates to the prior judge’s findings without performing an independent analysis. See Salters v. State, 802 So.2d 501, 502 (Fla. 4th DCA 2001) (reversing where the successor judge “declined to familiarize [him]self with the case” and instead sentenced the defendant in conformity with the previous judge’s “intension] to impose the most stringent *841 sentence possible”); Caplinger v. State, 271 So.2d 780, 781 (Fla. 3d DCA 1973) (reversing where the successor judge “relied solely upon statements of counsel to become informed on the case”).
In this case, Peters relies on certain of Judge McCann’s statements[4] at the hearing to suggest that he improperly rubber stamped Judge Walsh’s previous sentences. This argument fails for two reasons. First, nothing categorically bars a successor judge from considering the sentence imposed by a prior judge; such a result would defy common sense, particularly where, as here, the offense was committed decades in the past and the prior judge had a better opportunity to evaluate the facts germane to sentencing while they were fresh. Second, Judge McCann emphasized that his sentence was constructed “regardless of what Judge Walsh would have done.” Because Judge McCann reviewed the record and conducted a full, extensive evidentiary hearing, his sentence was an act of independent judgment; that he considered Judge Walsh’s prior pronouncement in molding his sentence is not grounds for reversal.

II

In his second issue, Peters contends that the trial court relied on improper factors in imposing sentence. We find no error.

Whether the Trial Judge Erred by Considering the Number and Severity of Peters’ Prior Offenses in Justifying an Upward Departure Sentence

Peters contends that the trial court violated his due process rights by imper-missibly relying upon the “numerosity” and “severity” of certain convictions to justify an upward departure sentence, even though these factors are necessarily included in calculating a defendant’s guideline sentence. We reject this argument and hold that under the sentencing framework applicable in 1991, the court properly considered convictions for the Indian River crimes that occurred after the crimes for which Peters was being sentenced.
To address this issue, we must first discuss the guideline sentencing applicable to Peters’ case. Unlike the current system, the applicable 1989 sentencing guidelines permitted a defendant to be sentenced within a “recommended” or “permitted” range. Under Florida Rule of Criminal Procedure 3.701(d)(8) (1989), “recommended sentences provided in the guidelines grid are assumed to be appropriate for the composite score of the offender,” and include a range “in order to permit some discretion.” The “permitted” range, on the other hand, “allow[s] *842 the sentencing judge additional discretion when the particular circumstances of a crime or defendant make it appropriate to increase or decrease the recommended sentence without the requirement of finding reasonable justification to do so and without the requirement of a written explanation.” Id. The “permitted” range is a calculated score and does not necessarily reflect the statutory maximum penalty for the given offense.
Within the 1989 sentencing framework, “[t]he proper procedure for imposing a guideline sentence requires the sentencing judge to consider the applicable recommended range before exercising his discretion to move into the permitted range.” Green v. State, 569 So.2d 888, 889 (Fla. 1st DCA 1990). Where, however, “extraordinary circumstances exist to ‘reasonably justify aggravating ... the sentence,’ ” Wemett v. State, 567 So.2d 882, 886 (Fla.1990) (quoting Fla. R. Crim. P. 3.701(d)(ll)), a trial judge is empowered to impose an upward departure above the “permitted” guideline sentence. See Williams v. State, 492 So.2d 1308, 1309 (Fla.1986); cf. Wick v. State, 651 So.2d 765, 766 n. 2 (Fla. 3d DCA 1995) (stating that sentencing a defendant within the permitted range, but outside of the recommended range, does not constitute a departure). In finding an upward departure to be appropriate under the applicable law and facts, the sentencing judge “must file contemporaneous written reasons for the departure.” Fain v. State, 888 So.2d 762, 763 (Fla. 2d DCA 2004). Where multiple reasons are given, “ ‘the departure shall be upheld when at least one circumstance or factor justifies the departure.’ ” Kirby v. State, 553 So.2d 1290, 1292 (Fla. 1st DCA 1989) (quoting § 921.001(5), Fla. Stat. (1989)).
As “an inherent component of the crime, ... [fjactors already taken into account in calculating the guidelines score can never support departure.” State v. Rousseau, 509 So.2d 281, 282 (Fla.1987) (quoting State v. Mischler, 488 So.2d 523, 525 (Fla.1986)). This is so since “allowing] the trial judge to depart from the guidelines based upon a factor which has already been weighed in arriving at a presumptive sentence would in effect be counting the convictions twice which is contrary to the spirit and intent of the guidelines.” Hendrix v. State, 475 So.2d 1218,1220 (Fla.1985).
In crafting a defendant’s scoresheet, points are allotted for the defendant’s “pri- or record” and “[a]ll other offenses for which the offender is convicted and that are pending before the court for sentencing at the same time.” Fla. R. Crim. P. 3.701(d)(4)-(5). Florida Rule of Criminal Procedure 3.701(d)(5)(a) (1991) defines “prior record” as including “any past criminal conduct on the part of the offender, resulting in conviction, prior to the commission of the primary offense.” (Emphasis added). In conformity with this definition, offenses committed after the pending instant offense are not considered “past criminal conduct.” Merriex v. State, 521 So.2d 249, 250 (Fla. 1st DCA 1988).
As a result of this sentencing structure, an anomalous situation results where, at the time of sentencing, the defendant has been convicted of an offense that occurred after the pending offense, since the conviction is obviously final yet it can neither be considered a “prior record” nor a “pending offense” at the time of sentencing. To rectify this incongruity, Florida law dictates that a trial court may “base a departure sentence on criminal convictions which cannot be scored as ‘prior record.’ ” Wichael v. State, 567 So.2d 549, 550 (Fla. 5th DCA 1990).
For example, in Harris v. State, 685 So.2d 1282, 1283 (Fla.1996), the defendant *843 committed a robbery with a weapon on May 18, 1991, along with a burglary two days later. On September 13, 1991, with the robbery charge pending, the defendant was convicted and sentenced for the burglary. Id. Some time thereafter, the defendant was convicted of the robbery charge and proceeded to sentencing, wherein the trial judge used the burglary conviction as grounds for an upward departure. Id. In upholding the use of the burglary conviction as a basis for departure, the Supreme Court reasoned that “disallowing departure completely would result in an unearned windfall to the offender simply because his offenses were tried ‘out of sequence.’ ” Id. at 1285. As a result, the court clarified that departure to incorporate “out-of-sequence” offenses is allowable, although the sentencing court must “treat the conviction as if it were scorable.” Id.
In the instant case, Judge McCann stated in his sentencing order that “upward departure from the recommended range of the sentencing guidelines” was justified because of “the defendant’s unscorable convictions.” In defense of his decision to incorporate these “unscorable convictions,” Judge McCann mirrored his statements from the sentencing hearing[5] and explained that the departure from the sentencing guidelines was based upon the number, severity, and violent nature of the crimes for which Peters was being resen-tenced as well as for the out-of-sequence Indian River crimes. In accordance with his ruling, Judge McCann then adjusted Peters’ scoresheet to incorporate his “out-of-sequence” offenses as if they had been scored as “prior record.”
Judge McCann’s ruling was consistent with Harris, since his justification for imposing an upward departure centered upon the unscorable nature of his “out-of-sequence” offenses, not the “numerosity” or “severity” of his pending offenses. Contra Rousseau, 509 So.2d at 283 (reversing where the trial court based an upward departure upon the fact that defendant committed three felonies in a three-week period, since such a consideration is already “factored into the guidelines score sheet”). That Judge McCann considered “numerosity” and “severity” in exercising his discretion is immaterial, since a proper basis for departure existed. See § 921.001(5), Fla. Stat. (1989) (“When multiple reasons exist to support a departure from a guideline sentence, the departure shall be upheld when at least one circumstance or factor justifies the departure regardless of the presence of other circumstances or factors found not to justify departure.”).

Whether the Trial Court Improperly Considered Uncharged Offenses and Offenses Not Before it When it Imposed Sentence

As his second sub-issue, Peters argues that the trial court committed reversible error by enhancing his sentence based upon (1) his second-degree murder charge, *844 which resulted in a nolle prosse, and (2) a CC for “reckless eyeballing of female [corrections] staff.”
Case No. 91-3⅛2- — Secondr-Degree Murder
“Generally, the trial court’s imposition of a sentence that is within the minimum and maximum limits set by the legislature ‘is a matter for the trial [c]ourt in the exercise of its discretion, which cannot be inquired into upon the appellate level.’ ” Nusspickel v. State, 966 So.2d 441, 444 (Fla. 2d DCA 2007) (quoting Shellman v. State, 222 So.2d 789, 790 (Fla. 2d DCA 1969)). However, an exception exists where “a court ... considers] charges of which an accused has been acquitted in passing sentence.” Epprecht v. State, 488 So.2d 129, 131 (Fla. 3d DCA 1986) (citing Townsend v. Burke, 334 U.S. 736, 740, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)) (emphasis added). Under these circumstances, “[w]hen portions of the record show the trial court relied upon prior acquittals in determining a defendant’s sentence, the State has the burden to demonstrate those considerations ‘played no part in the sentence imposed.’ ” Williams v. State, 8 So.3d 1266, 1267 (Fla. 1st DCA 2009) (quoting Doty v. State, 884 So.2d 547, 549 (Fla. 4th DCA 2004)) (emphasis added).
The justification for this rule is that a defendant should not be punished for offenses he or she did not commit. In the instant case, however, Peters was never “acquitted” of the second-degree murder charge; instead, the State voluntarily abandoned its prosecution through a nolle prosse. Unlike a judgment on the merits, “a nolle prosse is merely a discretionary decision by the State Attorney to be unwilling to prosecute; it does not operate as an acquittal nor does it bar further prosecution.” Al-Hakim v. Roberts, No. 8:08-CV-01370-T-17-EAJ, 2009 WL 2147062, at *4 (M.D.Fla. July 13, 2009). Thus, Peters’ dropped charge should be analyzed similarly to a prior or subsequent arrest where the State foregoes prosecution.
“While the due process clause does prohibit a court from considering charges of which an accused has been acquitted when passing sentence, it does not preclude the court from considering all relevant factors when imposing a sentence authorized for the crime of which the defendant was convicted.” Howard v. State, 820 So.2d 337, 340 (Fla. 4th DCA 2002) (footnote omitted). Within this framework, there is “no United States Supreme Court precedent requiring exclusion of arrests not leading to convictions in state sentencing procedures.” Jansson v. State, 399 So.2d 1061, 1063 (Fla. 4th DCA 1981). As we have explained,
[A] trial court can consider a defendant’s prior arrests not leading to convictions for purposes of sentencing so long as the court recognizes that these arrests are not convictions or findings of guilt, and the defendant is given an opportunity to explain or offer evidence on the issue of his prior arrests.
Id. at 1064.
Despite this clear language, application of the above rule has proven difficult among Florida’s district courts, as some opinions adhere to the rule’s literal language while others focus on the more subjective aspects of the trial judge’s consideration, and reverse where a sentencing court may have given excessive weight to crimes for which a defendant was arrested but not convicted.
Dowling v. State, 829 So.2d 368 (Fla. 4th DCA 2002), demonstrates adherence to the Jansson rule. There, the defendant entered a plea of no contest to possession of cocaine and two lesser drug-related charges; all of the evidence pertaining to these charges arose from a search per *845 formed incident to the defendant’s later-dismissed charges of lewd or lascivious molestation of a minor and delivery of a controlled substance to a minor. Id. at 369. At the sentencing hearing, the State conceded that it dismissed the original minor-related charges “since it could not prove them,” but nonetheless requested the court to consider “the fact that there is evidence [the defendant] gave drugs to children.” Id. The trial court agreed and heard evidence from five witnesses as to the circumstances of the dismissed charges and the effect they had upon the minor children. Id. at 369-70.
In upholding the defendant’s sentence, we applied Jansson, finding determinative that the trial court “knew that these arrests were not convictions” and “the defendant was given a full opportunity to explain his position and call his own witnesses.” Id. at 371. Moreover, relying in part upon the fact that defense counsel never objected to the sentencing procedure, we did not evaluate the extent of the trial court’s consideration of the abuse charge. See, e.g., Whitehead v. State, 21 So.3d 157, 160 (Fla. 4th DCA 2009) (upholding the consideration of the defendant’s pending charges since (1) they were “relevant to the sentencing because it involved the defendant’s conduct toward minors,” (2) the defendant “was not punished for [the] pending charge,” and (3) “he had not been acquitted of the pending charge”).
By contrast, the first district has held that consideration of prior arrests during sentencing is impermissible where the trial court “equates” those arrests with evidence of guilt. In Crosby v. State, 429 So.2d 421, 422 (Fla. 1st DCA 1983), the sentencing judge made reference to the juvenile defendant’s prior arrests that resulted in either a non-filing or a nolle prosse, remarking, “[T]he juvenile may, in fact, be guilty, not legally or adjudicated, but the facts are such that it is a prima face case that he is guilty, even though it may show a nol pros.” The trial court then relied upon these dispositions to find the defendant unsuitable for treatment as a youthful offender, before sentencing him to a term of imprisonment. Id.
Under these circumstances, the first district found the trial court to have reversibly erred by “impermissibly considering] prior arrests of [the defendant] not leading to convictions as evidence of guilt.” Id. at 423. In reaching this conclusion, the court distinguished our decision in Jansson, as one where “the trial judge candidly discussed his consideration of the arrest in regard to the sentencing, but indicated that the primary reason for the sentence was not the arrest record of the defendant, but was in fact the crime in question.” Id. (emphasis added).
We see Crosby as drawing too subjective a line by focusing on whether a sentencing court places undue weight upon crimes for which a defendant was arrested but not convicted. Id.; cf. Seays v. State, 789 So.2d 1209, 1210 (Fla. 4th DCA 2001) (distinguishing Jansson and reversing a guideline sentence where the trial judge considered subsequent arrests that had not resulted in convictions and did not provide the defendant an opportunity to explain).
Here, Judge McCann tiptoed the line between merely considering the arrest and assuming that the defendant was guilty. As Peters contends, there was “nothing in the record to indicate why the second degree murder charge was dropped,” other than Peters’ testimony that the State learned he was in jail at the time of the offense. Nonetheless, Judge McCann opined about the correlation between that charge and the plea Peters received for 90-1160, stating:
*846 I definitely would ask myself how that happened. But to make as part of the deal the dismissal of a second degree murder charge, that was even more baffling.
I assume there was something behind it that just wasn’t apparent. Maybe he cooperated. I thought I would hear something about that today. Maybe he cooperated and testified against somebody else in some other case. I don’t really know. But those were the two worst cnmes of his dime spree and those were the crimes that he has paid the least for.
Although the issue is a close one, when the above statements are read in the context of the entire sentencing hearing, this case is controlled by Dowling and Jans-son. The trial court understood that the nolle prosse in the murder case was not the same as a conviction or a finding of guilt. Peters was given an opportunity to present his side of the story concerning the dropped charges. Based on the entirety of the sentencing hearing, we conclude that, along with Judge McCann’s evaluation of the extent of Peters’ rehabilitation, the sentence arose from the crimes that Peters committed, not those that he did not commit.

Conduct in Prison

Peters contends that the trial court improperly relied upon unsubstantiated evidence when it expressed concern regarding his conduct directed towards women while in prison. Peters points to the following statement of the trial court while imposing sentence:
But, that said, I thoroughly reviewed his prison history. I noted a couple of offenses that did involve sexual type conduct in my view involving women. And that also gave me great cause for pause. A sex crime is a sex crime.
As a general rule, “unsubstantiated allegations of misconduct may not be considered by a trial judge at a criminal sentencing hearing and to do so violates fundamental due process.” Reese v. State, 639 So.2d 1067, 1068 (Fla. 4th DCA 1994). Here, however, the record evidence shows that Peters received a DR on June 21, 1998, which was sexual in nature and resulted in a deduction of 90 days gain time. In a supporting worksheet, the female officer who witnessed the incident stated:
At approximately 7:30 pm on June 21, 1998, while assigned as Delta dormitory officer I was sitting in the officer’s station when I observed Inmate Peters, Keith DC # 139318 in Quad 2 top shower stroking his erected penis in an upward and downward motion while staring directly at me. The shift supervisor was notified and authorized the writing of this report. Inmate Peters will remain in Administrative Confinement pending disposition of this report.
In a separate instance, Peters also received a CC for “reckless eyeballing of female staff.”
Although neither of these allegations resulted in criminal or disciplinary charges, both were relevant evidence of Peters’ potential sexual misconduct. The trial court could properly consider “all relevant factors” in fashioning an appropriate sentence. The law did not place blinders on the sentencing judge regarding Peters’ acts after entering prison, particularly where Peters contended that he had been rehabilitated during his incarceration.
Whether the Tnal Court Erred in Allocating Scoresheet Points for a Crime Entered Into After the Initial 1991 Sentencing
In 90-1160, Peters entered into a negotiated plea to the lesser included offense of an attempted lewd act in the presence of a child. The sentencing court *847 erred in allocating 12 points to this crime in computing Peters’ modified upward departure scoresheet, since the negotiated plea was entered into after Peters’ initial 1991 sentencing. As the Supreme Court clarified in Smith v. State, 536 So.2d 1021, 1022 (Fla.1988), a trial court may not recalculate a defendant’s scoresheet on re-sentencing to include subsequent convictions that were not considered during the original sentencing. As the Court explained:
Equity compels us to vacate Smith’s life sentence and remand the case for sentencing within the original range of three and one-half to four and one-half years. If Smith had been properly sentenced in the initial proceeding, he would not be facing life imprisonment. To sustain the life sentence would be to punish Smith for the trial court’s mistakes. The more equitable result is to place him in the position he would have been in absent the court’s error.
Id.; see also Pittman v. State, 604 So.2d 1263, 1265 (Fla. 4th DCA 1992) (reversing where the trial court “resentenced appellant based on a new scoresheet that included additional prior convictions not scored on the original scoresheet”). Nonetheless, since the subtraction of the twelve points from Peters’ scoresheet would not have altered his “recommended” or “permitted” sentence, this error was harmless.
Whether the Trial Court Committed Reversible Error by Considering Peters’ Failure to Exhibit “Remorse” or “Take Responsibility ”
Peters argues that in imposing a 99 year sentence, the trial court impermis-sibly considered his failure to “take responsibility” for the factual allegations of his convictions.
Peters relies upon cases that hold that “it is constitutionally impermissible for [the sentencing court] to consider the fact that a defendant continues to maintain his innocence and is unwilling to admit guilt.” Ritter v. State, 885 So.2d 413, 414 (Fla. 1st DCA 2004); Soto v. State, 874 So.2d 1215, 1217 (Fla. 3d DCA 2004) (“[Continued protestations of innocence, and unwillingness to admit guilt should not be factors taken into consideration by a court in sentencing a defendant.”). These cases also indicate that it is “generally improper for the sentencing court to consider the defendant’s lack of remorse.” Robinson v. State, 108 So.3d 1150, 1151 (Fla. 5th DCA 2013). These holdings emanated from cases where a defendant consistently maintained his innocence. See Hannum v. State, 13 So.3d 132, 135-36 (Fla. 2d DCA 2009); Donaldson v. State, 16 So.3d 314 (Fla. 4th DCA 2009); Gilchrist v. State, 938 So.2d 654 (Fla. 4th DCA 2006) (defendant maintained that he acted in self-defense); Lyons v. State, 730 So.2d 833, 834 (Fla. 4th DCA 1999); Exposito v. State, Dep’t of Bus. Regulation, 508 So.2d 451, 452 (Fla. 3d DCA 1987) (“[A] party may not be penalized for lack of ‘remorse’ where he has a legitimate right to maintain his innocence.”); Hubler v. State, 458 So.2d 350, 353 (Fla. 1st DCA 1984). As the Supreme Court has explained:
A defendant has the right to maintain his or her innocence and have a trial by jury. Art. I, § 22, Fla. Const. The protection provided by the fifth amendment to the United States Constitution guarantees an accused the right against self-incrimination. The fact that a defendant has pled not guilty cannot be used against him or her during any stage of the proceedings because due process guarantees an individual the right to maintain innocence even when faced with evidence of overwhelming guilt. A trial court violates due process *848 by using a protestation of innocence against a defendant. This applies to the penalty phase as well as to the guilt phase under article I, section 9 of the Florida Constitution.
Holton v. State, 573 So.2d 284, 292 (Fla.1990).
However, a different situation arises where a defendant has entered pleas of guilty to numerous felonies and takes the position at his resentencing, after years in prison, that he has been rehabilitated. Remorse is a part of rehabilitation. As we have observed,
[i]f a defendant is remorseful, it means that he is sorry he committed the crime for which he is to be sentenced. One who so regrets his acts may not commit such acts in the future.
St. Val v. State, 958 So.2d 1146, 1146 (Fla. 4th DCA 2007); see also Lincoln v. State, 978 So.2d 246 (Fla. 5th DCA 2008) (permitting judge to take lack of remorse into consideration where defendant’s trial testimony admitted criminal conduct). Here, there was no dispute about Peters’ participation in criminal conduct, merely a quibble about the nature of his participation. Because Peters injected the issue of his rehabilitation into the case, the trial court permissibly could have considered all factors relevant to his rehabilitation and fitness to rejoin society.

Ill

In his next issue on appeal, Peters contends that the trial court violated the requirements of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), by enhancing his sentence by 21 “victim injury” points, because of a shooting during one of the robberies, since the occurrence of the shooting was never determined by a jury. We do not reach this issue because Peters failed to preserve it in the circuit court at his resentencing. In Apprendi, the United States Supreme Court held that, “[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” 530 U.S. at 490, 120 S.Ct. 2348. Four years later, in Blakely v. Washington, 542 U.S. 296, 303, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the Supreme Court clarified that “the ‘statutory maximum’ for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.” Although both Apprendi and Blakely were decided well after Peters’ 1989 offenses, both are pertinent as they “apply to all de novo resentencings that were not final when Apprendi and Blakely issued regardless of when the conviction or original sentence was final.” State v. Fleming, 61 So.3d 399, 408 (Fla.2011).
As this Court has recognized, “Blakely contemplated facts ‘admitted by the defendant’ to mean facts the defendant admitted in a guilty plea, at sentencing, or in a stipulation at trial, or judicial findings to which the defendant assented.” Donohue v. State, 979 So.2d 1058, 1059 (Fla. 4th DCA 2008) (citing Galindez v. State, 955 So.2d 517, 523 n. 2 (Fla.2007)) (emphasis added). Here, Peters testified at the sentencing hearing that his codefendant shot a victim during the commission of an armed robbery. Thus, the occurrence of the injury was admitted, leaving only the issue of whether the trial court erred in allotting 21 victim injury points. See Johnson v. State, 700 So.2d 151, 152 (Fla. 3d DCA 1997) (finding the rule of Appren-di and Blakely to be satisfied where “all defendants actively participated in the armed robbery, and the shooting occurred during the course of the armed robbery”); Taylor v. State, 619 So.2d 1017, 1018 (Fla. *849 5th DCA 1993) (aider and abetter can be imputed victim injury points).
“Victim injury” points are enhancements to a defendant’s guideline sentence “for physical injury or death suffered by a person as a direct result of any offense pending before the court for sentencing.” Fla. R. Crim. P. 3.702(d)(5). “At the sentencing proceeding the burden is on the defendant to object if he contends that victim injury points have been inappropriately assessed.” Marcado v. State, 735 So.2d 556, 558 (Fla. 3d DCA 1999). As a result, “[l]ike any other type of alleged error, the general rule is an objection that is both specific and contemporaneous must be raised to allow review of an Apprendi claim,” including challenges to the assessment of “victim injury” points. Sims v. State, 998 So.2d 494, 507 n. 12 (Fla.2008); see, e.g., Matthews v. State, 714 So.2d 469, 469 (Fla. 1st DCA 1998) (defense counsel waived argument as to assessment of victim injury points by failing to make timely objection); Perryman v. State, 608 So.2d 528, 528 (Fla. 1st DCA 1992) (“[T]he appellant advised the court that the computation was correct, and he expressly agreed to the assessment of points for victim injury. In these circumstances, the issue has not been preserved for appellate review.”). The applicable rationale is that such an objection “alert[s] the trial court to the necessity of receiving additional evidence at the sentencing hearing regarding the extent of victim injury.” State v. Montague, 682 So.2d 1085, 1088 (Fla.1996) (citation omitted).
Here, Peters failed to contest the assessment of his “victim injury” points during resentencing. Since resentencing is a de novo proceeding, it is insufficient that he challenged the issue in the original sentencing,[6] particularly where, as here, that proceeding was before a different judge. Since the issue has not been preserved, we affirm on this issue.

IV

Peters next contends that his 99 year sentence violates the Equal Protection Clause on the grounds that it is vastly disproportionate to the sentence imposed upon his older, and more culpable, co-defendant. We agree with the State that such a comparative review of sentences is limited to instances involving imposition of the death penalty.
“A review of a sentence in the context of a constitutional violation is subject to de novo review.” Dempsey v. State, 72 So.3d 258, 262 (Fla. 4th DCA 2011) (citing Guzman v. State, 68 So.3d 295, 296 (Fla. 4th DCA 2011)). “Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals.” Solem v. Helm, 463 U.S. 277, 290, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).
Although clothed as an Equal Protection argument, Peters’ contention of disparate sentencing boils down to a request for this court to extend the proportionality-between-co-defendants review, typically reserved for death penalty cases, to criminal sentencing at large. Given the history of this area of law, however, we reject Peters’ argument, recognizing that “death is different.” Walker v. State, 707 So.2d 300, 319 (Fla.1997) (quoting Crump v. State, 654 So.2d 545, 547 (Fla.1995)).
*850 In Florida, comparative proportionality-review of co-defendants’ sentences originates from Furman v. Georgia, 408 U.S. 238, 239-40, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), where the United States Supreme Court struck down Georgia’s system of arbitrarily enforcing capital punishment as violative of the Eighth Amendment’s protection against cruel and unusual punishment. In State v. Dixon, 283 So.2d 1, 6 (Fla.1973), our Supreme Court interpreted Furman to stand for the proposition that while capital punishment was not abolished, it is the “quality of discretion,” not the “presence of discretion,” in sentencing procedures that is central to whether a capital punishment system will be deemed constitutional. Thus, the Court held, “if the judicial discretion possible and necessary ... can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of Furman ... has been met.” Id. at 7.
In fashioning a means to curtail arbitrariness, the Court pointed to the singular nature of the death penalty, recognizing it as “a unique punishment” that should be reserved only for “the most aggravated and unmitigated of most serious crimes.” Id. After outlining certain aggravating and mitigating factors to consider in imposing death, id. at 8-10, the Court stated its intention in creating a non-discriminatory system through the “guarantee[ ] that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case.” Id. at 10. As the Court explained:
No longer will one man die and another live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great. Thus, the discretion charged in Fuman ... can be controlled and channeled until the sentencing process becomes a matter of reasoned judgment rather than an exercise in discretion at all.
Id. As can therefore be seen, the Supreme Court imported such comparative proportionality review to advance the goals of Furman, while limiting the death penalty to only the most aggravated of murders. See Williams v. State, 37 So.3d 187, 205 (Fla.2010) (“The Eighth Amendment to the United States Constitution and this Court’s proportionality review require that the death penalty ‘be reserved only for those cases that are the most aggravated and least mitigated.’ ” (quoting Crook v. State, 908 So.2d 350, 357 (Fla.2005))).
For non-death penalty cases, a more “narrow” concept of proportionality applies. Within this context, the Eighth Amendment provides “a guarantee of proportionality” that “acts as a minimum standard.” Hale v. State, 630 So.2d 521, 525 (Fla.1993). However, “[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are ‘grossly disproportionate’ to the crime.” Ewing v. California, 538 U.S. 11, 23, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)).
In applying this “minimum standard,” we have held that “proportionality analysis focuses on the crime charged and the legislatively imposed punishment for the crime, not the specific facts of a particular case.” Edwards v. State, 885 So.2d 1039, 1039 (Fla. 4th DCA 2004). Within this context, we recognize that “[i]t is within the legislature’s power to prohibit any act, determine the class of an offense, and prescribe punishment.” Iacovone v. State, 639 So.2d 1108, 1109 (Fla. 2d DCA 1994) (citing State v. Bailey, 360 So.2d 772, 773 *851 (Fla.1978)). Moreover, nothing “in the Constitution ] require[s] a State to fix or impose any particular penalty for any crime it may define or to impose the same or ‘proportionate’ sentences for separate and independent crimes.” Williams v. Oklahoma, 358 U.S. 576, 586, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959).
Here, Peters’ 99 year sentence for participating in each violent armed robbery is not “disproportionate” standing on its own. See Wiley v. State, 2013 WL 692412, at *4 (Fla. 4th DCA Feb. 27, 2013) (upholding a sentence of life imprisonment where defendant accidentally shot the victim during the commission of a crime). In addition, because this is not a death penalty case, constitutional analysis does not require a comparison with the sentence received by a co-defendant.

Whether Peters’ 99 Year Sentence was Unconstitutional as a Violation of Graham’s Ban on Sentencing Non-Homicide Juveniles to Life Imprisonment Without the Possibility of Parole

In his next issue on appeal, Peters contends that, in the wake of the Graham decision, sections 775.082(3)(b)[7] and 812.13(2)(a),[8] Florida Statutes (1989), are unconstitutional as applied to juveniles, since the maximum penalty for an aggravated first degree felony is harsher than the sentence faced by a juvenile convicted of a life felony. Although stated generally, we understand Peters’ challenge as invoking both the Equal Protection Clause and the Eighth Amendment’s ban against cruel and unusual punishment. The Eighth Amendment argument has merit.
As established by the legislature, sentencing in Florida centers around a graduated system, where criminals are placed into classes of potential punishment based on the seriousness of each offense. See Burdick v. State, 594 So.2d 267, 268 (Fla.1992). The legislature has created separate classes subject to increased levels of punishment: misdemeanor defendants are punished less harshly than felons; first, second, and third degree felons face less punishment than life felons; and only capital felons face the possibility of death.
Within this system, section 812.13(2)(a), Florida Statutes (1989), of which Peters was convicted, provides the upper echelon of punishment for first degree felons. Section 812.13(2)(a) serves to enhance a robbery offense beyond the 30 years typically reserved for first degree offenses to any “term of years not exceeding life imprisonment” for instances where “in the course of committing [a] robbery the offender carried a firearm or other deadly weapon.” (Italics supplied). By enacting this enhancement, the legislature’s purpose was to further “the policy of this State to deter the criminal use of firearms,” McDonald v. State, 957 So.2d 605, 611 (Fla.2007), by increasing punishment *852 for robbers who bring a gun to an already violent event. By capping this enhancement at a term of years not to “exceed[ ] life imprisonment,” the legislature set the penalty a theoretical notch below the maximum penalty allotted for a life felony, despite the minimal real-world impact of this distinction. See Mills v. State, 642 So.2d 15, 17 (Fla. 4th DCA 1994) (stating that sentences “that presumably exceed life expectancy ... do not exceed the statutory limit when a term of years not exceeding life imprisonment is authorized by statute”).
Life felonies, on the other hand, are controlled by a separate set of rules. A life felony committed between October 1, 1983, and July 1, 1995,[9] “is punishable by life imprisonment or by a term of imprisonment not to exceed foriy years.” Peters v. State, 658 So.2d 1175, 1175-76 (Fla. 2d DCA 1995) (citation omitted) (emphasis added); § 775.082(3)(a), Fla. Stat. (1989). Therefore, within this time period, “whenever a court sentencing a life felony opts for a term of years in lieu of a life sentence, that court is limited to a sentence no harsher than foriy years.” Peters, 658 So.2d at 1176 (citing Greenhalgh v. State, 582 So.2d 107 (Fla. 2d DCA 1991)) (emphasis added).
A “statutory anomaly” arises, however, when this sentencing scheme is evaluated under the United States Supreme Court’s decision in Graham, which held that “[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide.” 130 S.Ct. at 2034. Because a juvenile facing a non-homicide life felony may not be sentenced to life without the possibility of parole, the practical reality is that, in such situations, a trial judge is limited to imposing any term of imprisonment up to forty years. See, e.g., Frison v. State, 76 So.3d 1103,1105 (Fla. 5th DCA 2011) (holding that section 775.082(3), Florida Statutes (1987), “gives the court the discretion to sentence [a juvenile defendant] to less than forty years”). On the other hand, since, within our district, Graham does not prohibit “de facto” life sentences, no such limitation is placed on aggravated first degree felonies, subjecting this “lesser” class to enhanced sentencing well beyond the forty-year cap. See, e.g., Guzman v. State, 110 So.3d 480 (Fla. 4th DCA 2013) (upholding juvenile defendant’s sixty-year sentence for violation of probation); Walle v. State, 99 So.3d 967, 973 (Fla. 2d DCA 2012) (trial court did not err in sentencing juvenile defendant to sixty-five years in prison, to run consecutive to a twenty-seven-year sentence for offenses in a different county); Mediate v. State, 108 So.3d 703 (Fla. 5th DCA 2013) (affirming juvenile defendant’s departure sentence of 130 years’ imprisonment, concurrent with other sentences).

Equal Protection

Attacking this inequitable “anomaly,” Peters asserts that his Equal Protection rights were violated, since a more culpable class of felons is subjected to lesser punishment. The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike. Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)). *853 As a provision that curtails government classification, San Antonio Indep. Sch. Dist v. Rodriguez, 411 U.S. 1, 59, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring), the Equal Protection Clause “deals with intentional discrimination and does not require proportional outcomes.” Rollinson v. State, 743 So.2d 585, 589 (Fla. 4th DCA 1999) (emphasis added).
“A criminal sentence violates the Equal Protection Clause only if it reflects disparate treatment of similarly situated defendants lacking any rational basis.” United States v. Pierce, 409 F.3d 228, 234 (4th Cir.2005) (citing United States v. Roberts, 915 F.2d 889, 891 (4th Cir.1990)). In determining whether a sentencing scheme comports with equal protection, the applicable test “is whether the classification rests on some difference bearing a reasonable relation to the object of the legislation.” State v. Slaughter, 574 So.2d 218, 220 (Fla. 1st DCA 1991) (citing Soverino v. State, 356 So.2d 269 (Fla.1978)). “This burden is a heavy one, with any doubts being resolved in favor of the statute’s constitutionality.” Samples v. Fla. Birth-Related Neurological, 40 So.3d 18, 23 (Fla. 5th DCA 2010) (citing McElrath v. Burley, 707 So.2d 836, 839 (Fla. 1st DCA 1998)).
In support of his equal protection argument, Peters relies on Bloodworth v. State, 504 So.2d 495, 496 (Fla. 1st DCA 1987), wherein the defendant was convicted of sexual battery with a deadly weapon, a life felony, and sentenced to life without the possibility of parole, as was mandated by statute. On appeal, the defendant argued that the sentencing structure employed violated his equal protection rights, since a defendant convicted of a capital felony, and not sentenced to death, could receive a lesser maximum sentence of life with the possibility of parole after 25 years. Id. at 498. In upholding the defendant’s sentence, the court outlined the rationale encompassing the legislature’s choice, explaining:
The legislature has chosen to denominate certain crimes as capital felonies and others as life felonies. With respect to the capital class, the legislature has essentially provided that if the capital offense is not so severe as to warrant the death penalty, then the penalty must be life imprisonment with the provision that the offender may be eligible for parole, but only after serving a minimum of 25 years. With respect to the life felony class, the legislature has, in effect, provided that if the life felony is not so severe as to warrant a life sentence (without eligibility for parole), then the penalty will be a term of years no greater than 40 years (again without eligibility for parole).
Appellant has failed to establish that there is no rational basis for such classifications. Moreover, it is clear that all persons falling within the life felony class are subject to the same range of penalties; so also with respect to those in the capital felony class.
Id. at 499.
Peters is correct in his assertion that the reasoning of Bloodworth is inapplicable to the case at hand, where the legislature’s express purpose has been frustrated due to the judiciary’s interference. However, the fact of this judicial meddling with sentencing statutes explains why equal protection is the incorrect spectrum from which to view the issue. Preliminarily, equal protection’s aim is to curtail intentional discrimination, Rollinson, 743 So.2d at 589, not to provide a cascading windfall once the legislature’s otherwise permissible intent is interrupted. Cf. Personnel Adm’r of Mass. v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (“[E]ven if a neutral law has a disproportionately *854 adverse effect ..., it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.”). Here, there was not intentional discrimination by the legislature; rather the sentencing inequality arose only because of the application of case law to a sentencing scheme. Moreover, “[a]n essential element of an equal protection claim is that the persons claiming disparate treatment must be similarly situated to those to whom they compare themselves.” Peterson v. Minn. Dep’t of Labor & Indus., 591 N.W.2d 76, 79 (Minn.Ct.App. 1999) (quotation omitted); City of Cle-burne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Here, it cannot be said that Peters and a person facing a life felony are similarly situated, as both are in separate classes and subject to separate sentencing procedures.

Eighth Amendment

Rather, the proper framework for analyzing the statutory anomaly resulting from Graham is through the non-death-penalty proportionality review under the Eighth Amendment.
“Embodied in the Constitution’s ban on cruel and unusual punishments is the ‘precept of justice that punishment for crime should be graduated and proportioned to [the] offense.’ ” Graham, 130 S.Ct. at 2021 (quoting Weems v. United States, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). Historically, since “ ‘[t]he length of [a] sentence ... is generally said to be a matter of legislative prerogative,’ ” Hale, 630 So.2d at 526 (quoting Leftmch v. State, 589 So.2d 385, 386 (Fla. 1st DCA 1991)), the Eighth Amendment’s protections are typically applied “relative to the mode and method of punishment, not the length of incarceration.” Hall v. State, 823 So.2d 757, 760 (Fla.2002), abrogation on other grounds recognized, in State v. Johnson, 122 So.3d 856, 862 (Fla. 2013) (footnote omitted).
Although the United States Supreme Court has “not established a clear or consistent path for courts to follow” in determining whether a particular sentence for a term of years can violate the Eighth Amendment, “one governing legal principle” has been recognized by the Court: a “gross disproportionality principle is applicable to sentences for terms of years.” Lockyer v. Andrade, 538 U.S. 63, 72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The Court noted that the gross proportionality principle is to be applied “only in the ‘exceedingly rare’ and ‘extreme’ case.” Id. at 73, 123 S.Ct. 1166 (quoting Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring)). In Florida, an “extreme sentence” may be stricken as “grossly disproportionate” to the crime where a court finds the following three objective factors to be satisfied:
First, a court must consider the “gravity of the offense and the harshness of the penalty.” [Solem, 463 U.S. at 292, 103 S.Ct. 3001, 77 L.Ed.2d 637.] Second, a court may examine “the sentences imposed on other criminals in the same jurisdiction.” Id. Third, a court may examine “the sentence imposed for the commission of the same crime in other jurisdictions.” Id.
Wiley, 2013 WL 692412, at *4 (quoting Andrews v. State, 82 So.3d 979, 984 (Fla. 1st DCA 2011)).
In applying this test, the Supreme Court has indicated that “[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive.” Solem, 463 U.S. at 291, 103 S.Ct. 3001. In an analogous situation, the Supreme Court of New Hampshire, in State *855 v. Dayutis, 127 N.H. 101, 498 A.2d 325, 328 (1985), invalidated its state’s second degree murder statute as disproportionate after finding the maximum penalty for the offense to exceed that of first degree murder. At the time the defendant committed his offense, second degree murder was punishable by a term of imprisonment from thirty-five years to life. Id. At the same time, the penalty for first degree murder was death or life imprisonment; however, following the Supreme Court’s decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which invalidated New Hampshire’s death penalty provision, the maximum sentence one could receive for first degree murder became “life imprisonment with an eighteen year minimum term.” Id.
Recognizing that “[t]he defendant’s sentence ... [wa]s clearly harsher than the maximum provided for first degree murder,” the Court invalidated the statute upon proportionality grounds. Id. at 329. In similar situations, other courts have found the imposition of a greater punishment for a lesser included offense to be constitutionally impermissible. See Roberts v. Collins, 544 F.2d 168, 170 (4th Cir.1976) (“Exact balances may not be attainable between unrelated offenses, but the Constitution does not sanction the imposition of a greater punishment for a lesser included offense than lawfully may be imposed for the greater offense.”); Thomas v. State, 264 Ind. 581, 348 N.E.2d 4, 7 (1976) (“The Eighth Amendment to the United States Constitution and Art. 1, sl6 of the Indiana Constitution have been interpreted by this Court as prohibiting the Legislature from providing punishments for lesser included offenses which are greater than those provided for the greater offenses.” (citations omitted)); Application of Cannon, 203 Or. 629, 281 P.2d 233, 235 (1955) (en banc) (invalidating, on proportionality grounds, statute conferring life imprisonment for an assault with intent to commit rape where the greater crime of rape authorized a sentence of not more than 20 years imprisonment).
In the instant case, the fact that Peters’ armed robbery conviction was not a “lesser included offense” of a specific life felony is a distinction without a difference.[10] See People v. Collins, 239 Mich.App. 125, 607 N.W.2d 760, 765 (1999). By creating a system of graduated penalty classes, the legislature established that certain crimes were more worthy of punishment than others, with life felonies standing a tier above aggravated first degree felonies. Under the current circumstance, Peters would have been better situated had he committed a life felony, a more serious crime under the legislative framework, than the crimes he committed. This is an affront to the Constitution that cannot stand. Therefore, under the applicable statutes, juvenile defendants convicted of aggravated first-degree felonies committed between October 1, 1983, and July 1, 1995, may not be sentenced beyond 40 years imprisonment.

V

As his final issue on appeal, Peters argues that his 99 year sentence is the functional equivalent of a life sentence, and therefore violates the decision in Graham. However, we have previously agreed with the second and fifth districts in holding that Graham applies only to actual life sentences without parole, not the “de fac-to” life sentences caused by lengthy term of years. See Guzman, 110 So.3d at 481; *856 Henry v. State, 82 So.3d 1084 (Fla. 5th DCA 2012) (holding that the defendant’s aggregate term-of-years sentence totaling 90 years was not invalid under the Eighth Amendment); Watte, 99 So.3d at (holding that Graham, as written, is concerned only with juvenile offenders sentenced to life without parole solely for a non-homicide offense, and affirming the defendant’s ninety-two year sentence).

Reversed and remanded for resentenc-ing.

MAY and FORST, JJ., concur.

. Specifically, the "out-of-sequence” charges were alleged to have occurred on October 21-22, 1989, while the six felony cases all occurred prior to October 13 of that year.

. Prior to 1993, inmates received statutory gain time of ten days per month for the length of the sentence. Inmates could also receive twenty days of incentive gain time per month, totaling up to thirty days credit for every month they serve.

. Rule 3.700(c)(1) provides in full:
In any case, other than a capital case, in which it is necessary that sentence be pronounced by a judge other than the judge who presided at trial or accepted the plea, the sentencing judge shall not pass sentence until the judge becomes acquainted with what transpired at the trial, or the facts, including any plea discussions, concerning the plea and the offense.

. At the hearing, Judge McCann stated:
So consistent with the recommendation of the State and also understanding as Judge Walsh was the judge who was actually involved with all the cases and, even though he has recused himself regarding this matter — and I believe that has something to do with the Public Defender's Office — otherwise, he would have re-sentenced him — if his feeling at the time of sentencing him is that he should never see light of day because of his crimes, suffice it to say that had Judge Walsh not recused himself, I’m not sure why his attitude would have changed. But regardless of what Judge Walsh might have done, I did consider what Judge Walsh’s pronouncement was in the transcript of the sentencing proceedings and could glean from it that Judge Walsh didn't think that this was just a matter of fact might-as-well-give-him-life-in-prison sentence. He thought it was something that was absolutely necessary, so — and even imposed numerous ninety-nine sentences consecutive to each other on top of the life sentence. So he definitely did not think that this Defendant should ever be released and become a part of the public; whereas, as under this sentence that is being requested by the State, he could actually get out in twenty-three years.
(Emphasis added).

. Specifically, Judge McCann stated:
But I will, for the record, make the finding that, given the numerosity and severity and high level of violence in the crimes that this Defendant is being re-sentenced for, the offenses that were out of sequence and were not previously scored I think should be considered for — as grounds for departure. And I am choosing therefore to depart from the criminal punishment code for the criminal — I’m not sure exactly what his formal name was back in 1991 when he was sentenced. But [under] the sentencing guidelines [], I'm finding that the offenses that are now set forth in the proposed scoresheet that appear as prior record offenses that they should be scored — not scored — but that they should be considered in determining what score he would have had if those were in fact not out of sequence or — and were all prior convictions.
(Emphasis added).

. In his brief, Peters’ sole references to raising this issue were performed at the 1991 sentencing.

. Section 775.082(3) sets the parameters for life felony and first degree felony sentencing, providing in its 1989 variation as follows:
(a) For a life felony committed prior to October 1, 1983, by a term of imprisonment for life or for a term of years not less than 30 and, for a life felony committed on or after October 1, 1983, by a term of imprisonment for life or by a term of imprisonment not exceeding 40 years;
(b) For a felony of the first degree, by a term of imprisonment not exceeding 30 years or, when specifically provided by statute, by imprisonment for a term of years not exceeding life imprisonment.
(Emphasis added).

. Section 812.13(2)(a) provides as follows:
If in the course of committing the robbery the offender carried a firearm or other deadly weapon, then the robbery is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s.775.082, s.775.083, or s.775.084.

. Under the current variant of the statute, life felonies committed on or after July 1, 1995, are punishable "by a term of imprisonment for life or by imprisonment for a term of years not exceeding life imprisonment.” § 775.082(3)(a)3., Fla. Stat. (2013). Accordingly, the constitutionality analysis applied in this opinion pertains only to juveniles convicted of crimes committed before July 1, 1995.

. It is feasible, for example, that a defendant charged with a life felony may enter a plea to a lesser first degree felony offense.