DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MIGUEL ANGEL ALFONSO-ROCHE,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D13-3689

[June 1, 2016]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; Curtis Disque, Acting Circuit Judge; L.T. Case No. 432012CF001344B.

Carey Haughwout, Public Defender, and Paul Edward Petillo, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Richard Valuntas, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

The defendant appeals his conviction and sentence for grand theft of a motor vehicle and first degree grand theft. He makes three arguments. First, he argues the prosecutor committed fundamental error by denigrating him during closing argument for asserting his right to a jury trial. Second, he argues the evidence was insufficient to support the charge of grand theft of a motor vehicle and his counsel was ineffective in failing to move for a judgment of acquittal. Third, he argues the trial court violated his constitutional rights in sentencing him to thirty years' imprisonment on the first degree grand theft charge and five years' imprisonment on the grand theft of a motor vehicle charge. We agree with him on the second issue and reverse the conviction and sentence on the grand theft of a motor vehicle charge. We affirm in all other respects.

The State charged the defendant with three counts of grand theft in varying degrees, which arose from the theft of one truck and two boats and their engines. Testimony at trial revealed that a deputy discovered two boats missing from the lot of an ocean engineering firm. The deputy

reported the incident, and began to canvass the area because stolen boats were usually taken to a nearby remote area and stripped of their engines.

The deputy returned to the ocean engineering firm and found padlocks on the ground, which looked like they had been cut with bolt cutters. The surveillance cameras were covered with black latex gloves. He then noticed two pickup trucks pull out of a neighborhood across the street; one was maroon and the other gray. This seemed suspicious because the neighborhood was under development.

The deputy pulled behind the maroon truck and identified the license plate; the defendant owned the truck. Because the deputy could not stop both trucks at the same time, he tried to identify the license plate on the gray truck. As he tried to pass the maroon truck to view the license plate number of the gray truck, the maroon truck blocked him from switching lanes.

The deputy turned on his "takedown" floodlights and flashed them into the back of the maroon truck, where he saw a Yamaha outboard engine cover for a boat engine. Oil also flew up onto the windshield of the deputy's car from the truck. The gray truck turned. The deputy reported the gray truck to his sergeant, and continued to follow the maroon truck.

The deputy initiated a traffic stop of the maroon truck after it ran a stop sign. As he approached the driver's side of the truck, he saw oil dripping out of the bed of the truck onto the bumper, which was covered in oil. He saw a boat engine in the back of the truck, smelled a strong odor of gas coming from it, and saw oil and gas dripping from the lines of the engine as if it had just been sliced or cut away from a boat. Bolt cutters, a box of black gloves consistent with those found on the surveillance cameras, a blow torch, and a stolen boat engine were found in the defendant's truck.

After receiving a call about the gray truck, a sergeant observed a truck matching the description. When he attempted to stop the truck, the driver would not pull over. The truck turned into the same undeveloped neighborhood the deputy had seen it leave from earlier. The truck crashed through the entrance gate and came to rest at a tree. The driver and passenger exited the truck while it was still moving. The sergeant apprehended the passenger; the driver fled the scene.

The sergeant noticed the ignition of the gray truck had been "punched." Upon further investigation, law enforcement discovered the truck had been stolen earlier in the evening. The sergeant located the two stolen boats sitting on their trailers inside the undeveloped neighborhood. Two marine

engines were found in the back of the gray truck along with numerous tools, including screwdrivers and wrenches. In total, three engines from the two stolen boats were recovered from the two trucks.

The three stolen engines were purchased in May 2012 for $77,729. Without the engines, one stolen boat was worth $50,000 and the other was worth $30,000. The boat trailers were purchased in April 2012 for $5,400 and $7,000. It cost $4,000 to reconnect the stolen engines to their boats, and $3,943 to repair the stolen gray truck.

After the State rested, defense counsel moved for judgment of acquittal, but only on the charge for first degree grand theft of property, not on the charge for theft of the gray truck. The court denied the motion. The defense did not present any witnesses.

The jury found the defendant guilty of grand theft of a motor vehicle and first degree grand theft. The State nolle prossed the second degree grand theft charge. The court adjudicated the defendant guilty and sentenced him to five years' imprisonment on the grand theft of the motor vehicle charge and thirty years' imprisonment on the first degree grand theft charge, with the sentences to run consecutively.[1]

On appeal, the defendant argues his conviction for grand theft of a motor vehicle should be reversed because there was no evidence that he knew the gray truck was stolen or that he had any involvement in its theft. He asserts that although defense counsel did not move for judgment of acquittal, his conviction on that charge was fundamental error because of the insufficiency of the evidence. In the alternative, he asserts trial counsel was ineffective for failing to move for judgment of acquittal.

The State responds that the defendant failed to preserve the issue for appellate review. It argues that had the issue been preserved, the defendant's argument is still without merit because the evidence established that the defendant knew the gray truck was stolen as he tried to prevent the deputy from viewing the license plate on the gray truck, and the ignition had been punched. Responding to the ineffective assistance

---

[1] The defendant twice moved to correct sentencing errors under Florida Rule of Criminal Procedure 3.800(b)(2) arguing that sentencing under the Criminal Punishment Code ("CPC") violates the Due Process Clause, the CPC violates the Cruel and Unusual Punishment Clause, and his sentence violated the Equal Protection Clause because his co-defendant was sentenced to only fifteen years' imprisonment. The trial court did not rule on those motions.

3

of counsel argument, the State argues the claim is not cognizable on direct appeal as the defendant failed to file a Rule 3.850 motion.

We have de novo review of the denial of a motion for judgment of acquittal. *Ortiz v. State*, 36 So. 3d 901, 902 (Fla. 4th DCA 2010) (citing *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002)). Where defense counsel fails to move for a judgment of acquittal, we review the issue for fundamental error. *Otero v. State*, 807 So. 2d 666, 667 (Fla. 4th DCA 2001); *see Andre v. State*, 13 So. 3d 103, 105 (Fla. 4th DCA 2009).

The defendant was convicted as a principal for the crime of grand theft of a motor vehicle. § 812.014, Fla. Stat. (2014).

> To convict under a principals theory, the State is required to prove that "the defendant had a conscious intent that the criminal act be done and . . . the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime."

*Hall v. State*, 100 So. 3d 288, 289 (Fla. 4th DCA 2012) (omission in original) (quoting *Smith v. State*, 76 So. 3d 1056, 1058 n.3 (Fla. 4th DCA 2011)). The essential elements of grand theft of a motor vehicle are the following:

> (1) [T]he knowing and unlawful obtaining or use, or the knowing and unlawful endeavor to obtain or use, (2) the motor vehicle of another, (3) with intent to either temporarily or permanently (a) deprive the owner or lawful possessor of the motor vehicle of a right to the vehicle or a benefit from it, or (b) appropriate the motor vehicle to the accused's own use or to the use of any person not entitled to it.

*Jones v. State*, 666 So. 2d 960, 964 (Fla. 3d DCA 1996). Here, the State failed to prove the defendant: (1) knew the gray truck was stolen, and (2) committed an act to assist the co-defendant in the theft of the gray truck.

The only evidence presented by the State on the grand theft of a motor vehicle charge came from the deputy who first discovered the boat theft. He testified that he first pulled behind the maroon truck driven by the defendant. When he tried to pass the maroon truck to get the license plate number on the gray truck, the defendant positioned his truck to prevent the deputy from passing him. The State argued that this conduct showed the defendant knew the gray truck had been stolen. That coupled with the

punched ignition in the gray truck was sufficient evidence to warrant the denial of a motion for judgment of acquittal. We disagree.

The deputy's testimony at best raised only a scintilla of suspicion of the defendant's guilty knowledge, insufficient to withstand a motion for judgment of acquittal, had one been made. *See, e.g.*, *A.D. v. State*, 106 So. 3d 67, 69 (Fla. 2d DCA 2013) (reversing grand theft auto conviction where state failed to present evidence that juvenile knew his friend intended on stealing the van and only entered the stolen van after it was stolen); *Canady v. State*, 813 So. 2d 161, 161 (Fla. 2d DCA 2002) (reversing conviction because defendant was merely a passenger in a vehicle that he knew was stolen).

In short, the State failed to present evidence that the defendant knew that the gray truck was stolen or that he assisted the co-defendant in stealing the truck. As a matter of law, the evidence did not support a conviction for grand theft of a motor vehicle, even under the principal theory. *See Hall*, 100 So. 3d at 289. The State's evidence was plainly insufficient and thus it was fundamental error for the defendant to be convicted of grand theft of a motor vehicle. *Andre*, 13 So. 3d at 105 ("[A] conviction imposed upon a crime totally unsupported by evidence constitutes fundamental error.").[2]

The defendant makes six arguments as to why his thirty-year sentence on the first degree grand theft charge should be reversed. He argues the sentence is arbitrary and violates his due process rights, violates the Cruel and Unusual Punishment Clause, and is disproportionate to that of his co-defendant's sentence in violation of the Equal Protection Clause. He also argues that the trial court's finding that the crime was committed with great sophistication is unsupported by the evidence; and the court failed to consider the cost to the public in imposing the maximum sentence, which should be reserved for the most serious offenses committed by persons with significant prior records. Because the sentence falls within statutory limits, we must affirm. *Howard v. State*, 820 So. 2d 337, 339 (Fla. 4th DCA 2002) (citing *Booker v. State*, 514 So. 2d 1079, 1081 (Fla. 1987)).

Judge Gross addresses these arguments in greater detail in his special concurrence. I concur in many of his observations. I strongly support the discretion given to judges in imposing sentences because there are so

---

[2] Because the defendant's conviction as a principal for grand theft of a motor vehicle must be reversed for insufficiency of the evidence, the defendant's claim for ineffective assistance of counsel need not be addressed.

many variables in every case. Yet, we do see sentences that beg for justification that the record does not provide.

We reverse the conviction on the grand theft of a motor vehicle charge and remand the case to the trial court to vacate the conviction and its corresponding five-year prison sentence. Because of the significance of the issue raised by the special concurrence, we certify the following question to the Supreme Court of Florida as being of great public importance:

> Does a sentence within the statutory maximum under the Criminal Punishment Code violate either the Due Process Clause or Eighth Amendment when it is significantly greater than the lowest permissible sentence on the defendant's scoresheet or the offered plea and grossly disproportionate to the median sentence imposed for similar crimes within the jurisdiction?[3]

*Affirmed in part; Reversed in part and Remanded.*

GROSS, J., concurs specially with opinion.
CONNER, J., concurs in part and dissents in part with opinion.

GROSS, J., concurring specially.

I concur in the majority's decision because current Florida law gives a sentencing judge unlimited discretion to sentence a defendant up to the maximum term set by the legislature for a particular crime. Also, the last time the Florida Supreme Court considered a cruel or unusual punishment challenge to a sentence, the court rejected it. *See Hall v. State*, 823 So. 2d 757, 76061 (Fla. 2002) (finding that the Florida Criminal Punishment Code did not violate federal or state constitutional guarantees

---

[3] The Florida Constitution requires conformity with the federal interpretation of the Eighth Amendment. Article I, Section 17 of the Florida Constitution requires that,

> [t]he prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution.

Art. I, § 17, Fla. Const.

against cruel or unusual punishment). However, *Hall* was decided prior to *Graham v. Florida,* 560 U.S. 48 (2010), *Miller v. Alabama,* 132 S. Ct. 2455 (2012), and *Adaway v. State,* 902 So. 2d 746 (Fla. 2005). An evolving concept of the type of punishment that is cruel or unusual compels the conclusion that the sentence in this case violates the Florida and United States Constitutions. Fairness, justice, and due process dictate that the sentence be reversed and the case remanded for resentencing.

*Brief Historical Review of Sentencing in Florida*

Criminal sentencing in Florida has come full circle in 40 years. Prior to the imposition of sentencing guidelines, other than the maximum term of years provided by statute and the occasional mandatory minimum, there were few restrictions on a judge's sentencing decision. One of the purposes of the 1983 adoption of the sentencing guidelines was "'to establish a uniform set of standards to guide the sentencing judge' and 'to eliminate unwarranted variation in the sentencing process by reducing the *subjectivity* in interpreting specific offense and offender-related criteria and in defining their relative importance in the sentencing decision.'" *Santiago v. State,* 478 So. 2d 47, 48 (Fla. 1985) (quoting *In re Rules of Crim. Proc. (Sent'g Guidelines),* 439 So. 2d 848, 849 (Fla. 1983)); *accord* Alan C. Sundberg et al., *A Proposal for Sentence Reform in Florida,* 8 FLA. ST. U. L. REV. 1 (1980) [hereinafter Sundberg]. The principles embodied by the sentencing guidelines were:

> 1. Sentencing should be neutral with respect to race, gender, and social and economic status.
> 2. The primary purpose of sentencing is to punish the offender. Rehabilitation and other traditional considerations continue to be desired goals of the criminal justice system but must assume a subordinate role.
> 3. The penalty imposed should be commensurate with the severity of the convicted offense and the circumstances surrounding the offense.
> 4. The severity of the sanction should increase with the length and nature of the offender's criminal history.
> 5. The sentence imposed by the sentencing judge should reflect the length of time to be served, shortened only by the application of gain time.
> 6. While the sentencing guidelines are designed to aid the judge in the sentencing decision and are not intended to usurp judicial discretion, departures from the presumptive sentences established in the guidelines shall be articulated in writing and made only for clear and convincing reasons.

7. Because the capacities of state and local correctional facilities are finite, use of incarcerative sanctions should be limited to those persons convicted of more serious offenses or those who have longer criminal histories. To ensure such usage of finite resources, sanctions used in sentencing convicted felons should be the least restrictive necessary to achieve the purposes of the sentence.

*In re Rule of Crim. Proc. (Sent'g Guidelines)*, 439 So. 2d at 849. The effect of the guidelines was to enhance sentencing neutrality and reduce subjectivity in sentencing.

The Sentencing Guidelines emerged at a time when there was a national concern about unreasonable sentencing variation. The "majority of the criticism regarding sentencing practices . . . focused upon judicial discretion." Sundberg at 4. In 1978, the Florida Supreme Court established a Sentencing Study Committee. *Id.* at 1 n.2. The Committee's "fundamental goal" was to "devise a system in which individuals of similar backgrounds would receive roughly equivalent sentences when they commit similar crimes, regardless of the differing penal philosophies of legislators, correctional authorities, parole authorities, or judges." *Id.* at 3.

Significantly, to ensure that judicial discretion did not trump the fair sentencing approach of the guidelines, trial judges were required to delineate their reasons for departures from the guidelines, both orally and in writing. Fla. R. Crim. P. 3702 (d)(18) (1994). This court reviewed such departures under an abuse of discretion standard. *See, e.g., Etienne v. State*, 780 So. 2d 1038, 1039 (Fla. 4th DCA 2001).

While the sentencing guidelines were well-intentioned, the criminal law became mired in the minutiae of scoresheets and whether a sentencing judge had articulated "clear and convincing reasons" for exceeding a presumptive guidelines sentence. Also, scoresheet issues proliferated in motions for postconviction relief.

In 1998, the legislature replaced the sentencing guidelines with the Criminal Punishment Code, applicable to all noncapital felonies committed on or after October 1, 1998. *In re Adoption of Fla. Rules of Crim. Proc. 3.704 and 3.992 to Implement the Fla. Crim. Punishment Code*, 721 So. 2d 265 (Fla. 1998); Ch. 98-204, Laws of Fla.; §§ 921.002-.0027, Fla. Stat. (2014). The legislature determined that it was "in the best interest of the state to develop, implement, and revise a sentencing policy." § 921.002(1), Fla. Stat. (1998). The Code "embodies" these "principles":

a) Sentencing is neutral with respect to race, gender, and social and economic status.

(b) The primary purpose of sentencing is to punish the offender. Rehabilitation is a desired goal of the criminal justice system but is subordinate to the goal of punishment.

(c) The penalty imposed is commensurate with the severity of the primary offense and the circumstances surrounding the primary offense.

(d) The severity of the sentence increases with the length and nature of the offender's prior record.

(e) The sentence imposed by the sentencing judge reflects the length of actual time to be served, shortened only by the application of incentive and meritorious gain-time as provided by law, and may not be shortened if the defendant would consequently serve less than 85 percent of his or her term of imprisonment as provided in s. 944.275(4)(b) 3. The provisions of chapter 947, relating to parole, shall not apply to persons sentenced under the Criminal Punishment Code.

(f) Departures below the lowest permissible sentence established by the code must be articulated in writing by the trial court judge and made only when circumstances or factors reasonably justify the mitigation of the sentence. The level of proof necessary to establish facts that support a departure from the lowest permissible sentence is a preponderance of the evidence.

(g) The trial court judge may impose a sentence up to and including the statutory maximum for any offense, including an offense that is before the court due to a violation of probation or community control.

(h) A sentence may be appealed on the basis that it departs from the Criminal Punishment Code only if the sentence is below the lowest permissible sentence or as enumerated in s. 924.06(1).

(i) Use of incarcerative sanctions is prioritized toward offenders convicted of serious offenses and certain offenders who have long prior records, in order to maximize the finite capacities of state and local correctional facilities.

§ 921.002(1), Fla. Stat. (2014).

The cost-benefit considerations contained in subsection 921.002(1)(i) later came into play during the 2008-09 fiscal crisis, when the legislature enacted section 775.082(10) "as a part of a cost-savings measure for the

Department of Corrections, and the legislative staff analysis characterized the statute as a 'prison diversion approach.'" *Jones v. State*, 71 So. 3d 173, 175 n.4 (Fla. 1st DCA 2011) (quoting FLA. COMM. ON WAYS & MEANS, BILL ANALYSIS & FISCAL IMPACT STATEMENT FOR CS/SB 1722, at 1 (2009)). Section 775.082(10) requires courts to "sentence certain non-violent low-scoring offenders to a non-state prison sanction unless the court finds that such a sentence could endanger the public." *Id.*

Under the Code, section 921.0024 provides for the preparation of a scoresheet for each defendant, which takes into account the severity of the defendant's primary offense at conviction, additional offenses at conviction, and prior criminal history. These factors are scored and the resulting total establishes a defendant's "lowest permissible sentence" which "is assumed to be the lowest appropriate sentence for the offender being sentenced." § 921.00265(1), Fla. Stat. (2014). While the trial judge may impose any sentence up to and including the statutory maximum for an offense, the court may not impose a sentence below the lowest permissible sentence unless there is a valid mitigating circumstance to justify such a downward departure. § 921.0026(1), Fla. Stat. (2014).

Section 921.0026(2) sets forth a nonexclusive list of mitigating circumstances that might justify a valid downward departure. The reasons for a valid downward departure are subject to appellate review, "in stark contrast to upward departures for which reasons need not be given at all" under the Criminal Punishment Code. *State v. Faulk*, 840 So. 2d 319, 322 (Fla. 5th DCA 2003) (Sharp, J., concurring).

By reestablishing judicial discretion up to statutory maximums, the Code makes a return to pre-1983 law. The Code embraces the same modified indeterminate sentencing structure that predated the Sentencing Guidelines—the "legislature establishes a maximum sentence for each category of criminal offense but provides the judiciary with the discretion to sentence an offender either to a specific period of incarceration or to a minimum-maximum range within the legislatively established limits." Sundberg at 6. It is as if the Guidelines' concerns about sentencing fairness, subjectivity, neutrality, and equality had petered out by 1998. The granting of unfettered upward discretion under the Code has opened Florida's door to the excessive sentence imposed in this case.

The problem with such unlimited sentencing discretion is that after a defendant is convicted in a jury trial, too many judges impose the maximum sentence allowed under the Code, under the rationale that they are sending a message to criminals. This approach frustrates the legislative intent expressed in the Code because it ignores the sentencing

factors contained in section 921.002(1).  Also, there is no research which supports the view that a harsh sentencing "message" has its desired effect; it is not as if there is a rational market theory of criminality where would-be criminals make an empirical study of sentencing practices before deciding on the geographical location of their crimes.  Relying on behavioral research, Judge Richard Posner of the Seventh Circuit has cast doubt on the actual deterrent effect of long sentences.  *See United States v. Presley*, 790 F.3d 699 (7th Cir. 2015).

*Appellate Courts May Address Constitutional Violations in Sentencing*

Under the current view of the Criminal Punishment Code, "the general rule in Florida is that when a sentence is within statutory limits, it is not subject to review by an appellate court." *Howard v. State*, 820 So. 2d 337, 339 (Fla. 4th DCA 2002).  "[A]n exception to the general rule against interfering with the length of a sentence" is "where the facts establish a violation of a specific constitutional right during sentencing." *Id.* at 339-40; *accord Evans v. State,* 816 So. 2d 742, 744 (Fla. 4th DCA 2002).  Examples of such violations are:  (1) when a sentencing court relies upon conduct for which a defendant has been acquitted, *Doty v. State*, 884 So. 2d 547, 549 (Fla. 4th DCA 2004), *Cook v. State*, 647 So. 2d 1066, 1067 (Fla. 3d DCA 1994), (2) where a judge imposes a sentence based on the race, religion, political affiliation, or national origin of the defendant, *Santisteban v. State*, 72 So. 3d 187, 197 (Fla. 4th DCA 2011), *Nawaz v. State*, 28 So. 3d 122, 124-25 (Fla. 1st DCA 2010), *Torres v. State*, 124 So. 3d 439, 442 (Fla. 1st DCA 2013), (3) where a judge takes his own religious beliefs into account in sentencing, *Santisteban*, 72 So. 3d at 197, (4) where a judge improperly considers a defendant's lack of remorse or failure to accept responsibility, *Davis v. State*, 149 So. 3d 1158, 1160 (Fla. 4th DCA 2014), *Moorer v. State*, 926 So. 2d 475, 477 (Fla. 1st DCA 2006), or (5) where a sentence is the product of judicial vindictiveness, *Hall v. State*, 823 So. 2d 757, 762 (Fla. 2002).  One aspect of judicial vindictiveness is where, after a jury trial, a sentencing judge punishes a defendant's refusal to accept a plea offer.  *See Mitchell v. State*, 521 So. 2d 185, 187 (Fla. 4th DCA 1988).

The prohibition against cruel or unusual punishment is another type of constitutional violation that can infect sentencing.  In *Miller v. Alabama*, the United States Supreme Court demonstrated a willingness to consider challenges to the proportionality of particular sentences outside the context of capital punishment.  132 S. Ct. 2455 (2012).  As the Court wrote,

The Eighth Amendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions. That right, we have explained, flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense. As we noted the last time we considered life-without-parole sentences imposed on juveniles, the concept of proportionality is central to the Eighth Amendment. And we view that concept less through a historical prism than according to the evolving standards of decency that mark the progress of a maturing society.

*Id.* at 2463 (internal citations omitted).

More significantly, in *Adaway v. State*, the Florida Supreme Court interpreted United States Supreme Court decisions to allow a challenge to a sentence based on its length alone:

We read the decisions in *Solem* [*v. Helm,* 463 U.S. 277 (1983)], *Harmelin* [*v. Michigan,* 501 U.S. 957 (1991)], and *Ewing* [*v. California,* 538 U.S. 11 (2003)] as requiring, for a prison sentence to constitute cruel and unusual punishment solely because of its length, that at a minimum the sentence be grossly disproportionate to the crime. The Court itself has announced that it is "clearly established" that "[a] gross disproportionality principle is applicable to sentences for terms of years." *Lockyer* [*v. Andrade,* 538 U.S. 63, 72 (2003)].

902 So. 2d at 750.

The record in this case establishes that the sentence here was the type of "grossly disproportionate" sentence contemplated in *Adaway*. At the time of sentencing, appellant was 55 years old with no prior criminal record. He was not convicted of a crime of violence or intrusion into a dwelling. There was no physically injured victim. There was no weapon. He rejected a plea offer of 3 years. His recommended lowest sentence under the Code was 23.7 months in prison. After he was convicted at trial, the state argued for a 25-year sentence. The maximum sentence for the two charges was 35 years. The court sentenced him to consecutive sentences totaling 35 years. By comparison, appellant's co-defendant, a twice convicted felon whose lowest permissible sentence was 47.1 months and maximum was 60 years, received a 15-year sentence. Given appellant's age, the sentence was tantamount to a life sentence that violates the prohibition against cruel or unusual punishment. *See, e.g.,*

*Adams v. State*, 37 Fla. L. Weekly D1865 (Fla. 1st DCA 2012) (holding that sentence which required juvenile defendant to serve at least 58.5 years in prison was a de facto life sentence for non-homicide offense).

Appellant has marshalled convincing evidence that his sentence was grossly disproportionate to other similarly situated defendants in the 19th Judicial Circuit. During the fiscal year 2011-12, 84 defendants were sentenced to prison in the 19th Judicial Circuit who scored between 23.7 to 28 months under the Criminal Punishment Code. The mean prison sentence for these defendants was 51.11 months and the median prison sentence was 36 months. The sentence imposed most frequently was 36 months.

Appellant's 420 month sentence greatly exceeded any of these numbers.[4] As appellant argues, "sentences for defendants with the same CPC score should be more uniform than sentences lumped together by offense." This makes sense because a CPC score takes into account the characteristics of the offender, most notably his prior record, and characteristics of the offense committed, such as its severity, victim injury, and firearm possession, as well as additional offenses at conviction.

When compared to defendants sentenced to nonstate prison sanctions and those whose CPC score was higher, the unusual punishment meted out to appellant becomes even clearer. Over the fiscal year 2011-12, 117 defendants in the 19th Judicial Circuit scored higher than appellant (23.8 or higher) and were sentenced to nonstate prison sanctions. Also, 433 defendants scored higher than appellant under the CPC, demonstrating a higher degree of blameworthiness—yet none received a sentence greater than appellant's 420 month sentence. As appellant argues, "no defendant who was sentenced to prison in the 19th Judicial Circuit in fiscal year 2011-2012 could point to appellant and say that appellant was treated more favorably than himself."

Disproportionately long sentences mask other constitutional violations in sentencing. First, in some courtrooms, sentencing is not "neutral with respect to race, gender, and social and economic status." § 921.002(1)(a),

---

[4] The sentence here also greatly exceeded that of similarly situated defendants in the other circuits within this district. For such defendants, the 15th Judicial Circuit had a mean prison sentence of 34.51 months, and a median sentence of 27.15 months. The 17th Judicial Circuit had a mean sentence of 29.36 months and a median of 26 months.

Fla. Stat. (2014).[5]  Second, in some courtrooms, some defendants receive a harsher sentence after they exercise their right to a jury trial.  *See* THE SENTENCING PROJECT ("It is widely acknowledged that defendants who go to trial and are found guilty instead of initially pleading guilty tend to receive harsher sentences; this is known as the 'trial penalty.'").  Of course, this practice "chill[s] the exercise of [the] Fifth Amendment privilege against self-incrimination" and the "Sixth Amendment right to have . . . guilt or innocence determined by a jury."  *McDonald v. State*, 751 So. 2d 56, 58 (Fla. 2d DCA 1999).

Reversals, however, occur only when the record reveals an improper sentencing motive.  *See Gallucci v. State*, 371 So. 2d 148 (Fla. 4th DCA 1979); *Stephney v. State*, 564 So. 2d 1246 (Fla. 3d DCA 1990).  The silent imposition of a trial penalty evades appellate review.  Similarly, sentences imposed without sufficient explanation can mask implicit biases, which are "activated involuntarily" and which "generally occur without our awareness or intentional control."  Hon. Dana Lee Marks, *"Who, Me? Am I Guilty of Implicit Bias?"* 54 ABA Judges' Journal No. 4, 20, 22 (Fall 2015).  Finally, the political reality is that judicial elections are not lost because of harsh sentencing.  Indeed, a recent study concluded that the "pressures of upcoming reelection campaigns affect judicial decision-making in criminal cases, making judges more likely to impose longer sentences."  KATE BERRY, BRENNAN CTR. FOR JUSTICE, HOW JUDICIAL ELECTIONS IMPACT CRIMINAL CASES 1 (2015).

Judicial silence presents an insurmountable obstacle to establishing a record of a constitutional violation in sentencing.  Such difficulty is evident in cases like *Mitchell v. State*, where the court painstakingly examined the record and found nothing that supported an inference of vindictiveness. 521 So. 2d at 190.  The trial judge "made no remarks which would give any indication that the harsher sentence was being imposed as a punitive measure for rejecting the previous [plea] offer."  *Id.*  It is the rare judge whose own words form the basis of a reversal of a sentence.  For this reason, focusing on an objectively disproportionate sentence as cruel or

---

[5] Statistical analysis demonstrates that in the United States there is significant racial disparity in sentencing decisions and these disparities rise with the severity of the given sentence.  ACLU, HEARING ON REPORTS OF RACISM IN THE JUSTICE SYSTEM OF THE UNITED STATES (2014).  Significantly, studies demonstrate greater racial disparity in sentencing non-violent crimes.  *Id.* at 3; *see also* TUSHAR KANSAL, THE SENTENCING PROJECT, RACIAL DISPARITY IN SENTENCING:  A REVIEW OF THE LITERATURE (Marc Mauer ed., 2005) [hereinafter THE SENTENCING PROJECT] (noting Black and Latino defendants are often sentenced more severely than similarly situated White defendants for "less serious crimes," such as drug and property crimes).

unusual punishment is the preferable way to prevent constitutional sentencing violations.[6]

Here the trial judge's stated reasons for the 35-year sentence do not justify the length of the sentence. The trial judge said that the crime—the stealing of boat motors—was committed with "great sophistication"; however, unlike a complex economic crime, the mechanics of this episode are hardly sophisticated. Planning a crime and wearing gloves to avoid detection is not synonymous with sophistication. At oral argument, the state relied on the defendant's Miami point of origin as a mark of sophistication. In the age of GPS technology, navigating to Martin County from Miami on I-95 is hardly the hallmark of a sophisticated criminal mind.

The maximum sentence imposed in this case runs afoul of the principles that the "penalty imposed [be] commensurate with the severity of the primary offense" and the "severity of the sentence increases with the length and nature of the offender's prior record." § 921.002(1)(c)-(d). The most compelling argument against this sentence is that a 35-year sentence for a 55-year-old offender with no prior criminal record is in essence a de facto life sentence.

It also fails to "maximize the finite capacities of state and local correctional facilities." § 921.002(1)(i). In 1995, a legislatively created task force identified as a core principle that the "state must preserve scarce criminal justice resources through the efficient delivery of services, the development of a cost effective range of sanctions, and the utilization of limited prison beds for the worst offenders." TASK FORCE FOR REVIEW OF CRIMINAL JUST. AND CORRECTIONS SYS., FINAL REPORT 1 (Jan. 1995).

Recognition of the practical "downside of long sentences is recent and is just beginning to dawn on the correctional authorities and criminal lawyers." *United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015).[7] In *Presley,* the Seventh Circuit remanded a case to enable the trial judge "to consider whether to resentence the defendant" in light of the sentencing policies expressed in the opinion. *Id.* at 704. There, a 34-year-old with a

---

[6] Various constitutional rights can be implicated in a sentencing. *See* Art. I, § 2, Fla. Const. ("No person shall be deprived of any right because of race, religion, national origin, or physical disability."); Art. I, § 9, Fla. Const. (right to due process); Art. I, § 16(a) (right to "a speedy and public trial by impartial jury"); Art. I, § 22 (right to a trial by jury).

[7] *See, e.g.*, Joe Palazzolo, *Prison Population Cuts Catch On*, WALL ST. J., Jan. 2-3, 2016, at A3.

lengthy criminal history was convicted of heroin and gun offenses and sentenced to almost 37 years in prison. *Id.* at 700-01. Writing for the majority, Judge Posner identified three sentencing policies that call into question the propriety of such a lengthy sentence.

First, the court questioned the deterrent effect of the long sentence. "Criminals, especially ones engaged in dangerous activities such as heroin dealing, tend to have what economists call a 'high discount rate'—that is, they weight future consequences less heavily than a normal, sensible, law-abiding person would." *Id.* at 701. "[T]he prospect of being in prison at age 60 is less worrisome to a 30 year old than the prospect of being in prison today—and the higher his discount rate, the less worrisome the prospect." *Id.* A long sentence may add "little additional deterrence, since every sentence increment is an increment in future, not present, punishment." *Id.* at 701-02.

Second, the sentencing court in *Presley* failed to consider whether sentencing the defendant into his sixties was necessary to prevent his return to criminal activities at that age.

> Sentencing judges need to consider the phenomenon of aging out of risky occupations. Violent crime . . . is generally a young man's game. Elderly people tend to be cautious, often indeed timid, and averse to physical danger. Violent crime is far less common among persons over 40, let alone over 60, than among younger persons.

*Id.* at 702.

Third, Judge Posner wrote that in evaluating a sentence there needs "to be considered the cost of imprisonment to the government, which is not trivial." *Id.* "If the deterrent or incapacitative effect on criminal propensities fades sharply with time, the expenses incurred in the incarceration of elderly persons may be a social waste." *Id.* Prisoners over 50 cost prison systems more than younger prisoners, mainly due to increased medical costs. *Id.* The recidivism rate of released inmates over 50 is less than 19 percent. *Id.* In considering the optimal sentence for an elderly prisoner, Judge Posner concluded:

> [P]robably the judge's primary focus should be on the traditional triad of sentencing considerations: incapacitation, which prevents the defendant from committing crimes (at least crimes against persons other than prison personnel and other prisoners) until he is released, general deterrence (the

effect of the sentence in deterring other persons from committing crimes), and specific deterrence (its effect in deterring the defendant from committing crimes after he's released). A sentence long enough to keep the defendant in prison until he enters the age range at which the type of criminal activity in which he has engaged is rare should achieve the aims of incapacitation and specific deterrence, while lengthening the sentence is unlikely to increase general deterrence significantly if the persons engaged in the criminal activity for which the defendant is being sentenced have a high discount rate; for beyond a point reached by a not very long sentence, such persons tend not to react to increases in sentence length by abandoning their criminal careers.

*Id.* at 703.

Under an evolving sense of what is an unconstitutional cruel or unusual sentence, the 35-year sentence in this case should not stand.

*One view of the Due Process Clause is that it requires judges to state their reasons for a sentence*

In the 1970s, many thoughtful commentators expressed concerns about sentences imposed without explanation. Judge Marvin Frankel wrote a book that influenced sentencing reform in Florida and elsewhere— CRIMINAL SENTENCES: LAW WITHOUT ORDER (1973). In it, he contended that a requirement that judges explain the reasons behind a sentence was a cornerstone of fairness:

> The point . . . is that the parties (especially the loser) are, on deep principles, not merely entitled to a decision; they're entitled to an explanation . . . . The duty to give an account of the decision is to promote thought by the decider, to compel him to cover the relevant points, to help him eschew irrelevancies—and finally to make him show that these necessities have been served. The requirement of reasons expressly stated is not a guarantee of fairness. The judge or other official may give good reasons while he acts upon outrageous ones. However, given decision-makers who are both tolerably honest and normally fallible, the requirement of stated reasons is a powerful safeguard against rash and arbitrary decisions.
>
> ***

> Since, as I have said, judges usually say little or nothing to explain their sentences, the possibility that they were moved by absurd or vicious considerations is not usually open to inquiry. And the circle proceeds to be closed. The judges, if they are merely human rather than depraved, do not enjoy being caught in error. *They know that an unexplained decision does not flaunt its possible fallacies. When they are not required to explain, many at least find this conclusive grounds for not explaining. There is no way of knowing, then, how many sentences, for how many thousands of years, have rested upon hidden premises that could not have survived scrutiny.*

*Id.* at 40-42 (emphasis added).

One legal scholar has argued that the due process clause requires judges to explain their sentencing decisions. Michael C. Berkowitz, *The Constitutional Requirement for a Written Statement of Reasons and Facts in Support of the Sentencing Decision: A Due Process Proposal,* 60 Iowa L. Rev. 205 (1974); *see also* Michael M. O'Hear, *Appellate Review of Sentences: Reconsidering Deference,* 51 Wm. & Mary L. Rev. 2123, 2125 (2010). Whether the hour for Professor Berkowitz's modest proposal has come round at last will have to be decided by a Court higher than this one.

*Adaway* opened a constitutional door that appeared to have been closed in *Hall.* For the above reasons, I agree with the certified question contained in the majority opinion.

CONNER, J., concurring in part and dissenting in part.

I concur with the majority opinion, except for the reversal on the charge of grand theft of a motor vehicle and the certification of the proposed question of great public importance. I dissent as to both.

I disagree that there was insufficient evidence that the defendant knew the gray truck was stolen or that he had any involvement in its theft. There are additional facts in the record that are not discussed in the majority opinion. The surveillance videos at the business property from where the boats were stolen establish the perpetrators wore masks in the process of removing the boats from the business premises to another location nearby to detach the motors. The other perpetrators involved in the heist were men much younger than the defendant.

In closing argument, the defendant argued that the evidence failed to negate the hypothesis that he did not know what the others were doing and that he was innocently assisting acquaintances, while sitting in, and never getting out of, his truck at a location other than the business property from which the boats were removed. Additionally, he pointed out that he is an older man, and stealing several three-hundred-pound boat motors is a "young man's game."

As the State argued in closing argument, the evidence supported the conclusion that the defendant was part of a well-orchestrated plan to steal boats and boat engines that included *stealing a truck* and using the *stolen truck* to move the boats and engines off premises to another location nearby. Use of the stolen truck was necessary so that the perpetrators' vehicles would not be caught on the multiple surveillance cameras at the business premises. Obviously, the perpetrators wanted to avoid identification and apprehension by wearing masks in the process of removing the boats and making sure that none of their vehicles were captured on camera until the cameras could be covered. The use of a stolen truck was necessary to avoid identification in the process of entering the business property, as well as to anticipate the possibility that the perpetrators might miss covering one of the cameras with gloves while the heist was ongoing. Additionally, as the prosecutor argued, the defendant's actions in blocking the deputy from coming around his vehicle while travelling closely behind the codefendant in the gray truck supports an inference that the defendant did not want the deputy to see the tag on the gray truck nor get a good look at the gray truck in order to radio information to dispatch or fellow officers because the defendant *knew* the vehicle was stolen.[8] The combination of evidence refuted the defense's assertion that the defendant was an innocent participant in the heist.

The defendant's driving in a manner to block the deputy from getting behind, along, or in front of the gray truck also supports an inference that the defendant was *assisting his codefendants in stealing the gray truck.* "In the context of an automobile theft, [intent] would be shown, if not by aid or participation in the taking of the vehicle, then by some exercise of dominion and control over [the vehicle] afterwards." *G.C. v. State,* 560 So. 2d 1186, 1187 (Fla. 3d DCA 1990). The act of keeping the deputy away

---

[8] Although the majority opinion discusses that the deputy shined his "takedown" floodlights on the defendant's truck, an additional fact not mentioned in the majority opinion is that the defendant was being pursued by the deputy at approximately 2:00 a.m. Darkness makes identification more difficult the more distance there is between vehicles. Thus, keeping the officer away from the stolen truck assisted the defendant in avoiding detection of that crime.

from the gray vehicle was evidence of the defendant's exercise of dominion and control over the gray truck.

"'In cases in which the evidence of guilt is wholly circumstantial, it is the trial judge's task to review the evidence in the light most favorable to the State to determine the presence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences.'" *Ballard v. State*, 923 So. 2d 475, 482 (Fla. 2006) (quoting *Crain v. State*, 894 So. 2d 59, 71 (Fla. 2004)). Therefore, "[t]he state is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the Defendant's theory of events." *Kocaker v. State*, 119 So. 3d 1214, 1225 (Fla. 2013) (quoting *Durousseau v. State*, 55 So. 3d 543, 556-57 (Fla. 2010)). The fact that a box of the same type of latex gloves used to cover the surveillance cameras was found in the truck the defendant was driving, coupled with (1) the manner of the defendant's driving to thwart the deputy following him, (2) additional facts evincing an intent to use a stolen truck in the process of removing the boats from the business property, and (3) other efforts to minimize the risk of detection and identification, rebuts any reasonable hypothesis of innocence (lack of knowledge of what the others were doing and that the truck was stolen and involvement in taking the vehicle).

In my view, *A.D. v. State*, 106 So. 3d 67 (Fla. 2d DCA 2013), relied upon by the majority, actually supports affirmance of the defendant's grand theft of motor vehicle conviction. Although A.D.'s adjudication of delinquency as to theft of a minivan was reversed, the adjudication as to theft of an ATV (all-terrain vehicle) was upheld because the State provided proof that A.D. "demonstrated a deliberate pattern of conduct" so that his actions went beyond mere presence at the scene. *Id.* at 71.[9]

For the above reasons, I would affirm the conviction for grand theft of a motor vehicle.

For three reasons, I also dissent from certifying the question posed by the majority as being of great public importance: (1) the question and reasoning expressed as support for the question may be viewed by some

---

[9] *Canady v. State*, 813 So. 2d 161, 161 (Fla. 2d DCA 2002), also relied upon by the majority, is factually dissimilar to this case and its brief discussion of legal principles offers little assistance in deciding this case. In *Canady*, the appellant was a passenger in a car that had been stolen. The one-page opinion does not discuss the facts in detail, but it appears there was no evidence, unlike this case, to directly or circumstantially show that the appellant was assisting in taking the vehicle.

as an attempt by the judiciary to expand its power of review in a way that ignores the separation of powers doctrine; (2) the reasoning in support of the question is premised upon an incorrect assumption that it is not appropriate to impose a maximum sentence (35 years) on a person 55 years of age with no prior record, after proceeding to trial in a case in which the State offered a plea bargain with a much lower prison sanction; and, (3) perhaps most disturbingly, the reasoning expressed as support for the question suggesting that constitutional principles should be expanded to correct arguably harsh sentences may be perceived as the majority suggesting, inferentially, that a systemic problem exists within the trial bench.

The question of great public importance posed by the majority asks our supreme court to entertain this case to analyze whether the Due Process Clause or Eighth Amendment was violated by the sentences imposed in this case. The arguments and assertions appear to be inspired by a concern that two maximum, consecutive sentences, "in essence a de facto life sentence," imposed on a 55-year-old defendant with no prior record for two felony theft offenses were unduly harsh. The direct assertion is that the sentences are grossly disproportionate and violate several of the principles embodied by section 921.002(1), Florida Statutes (2015), the Criminal Punishment Code. The indirect assertion is that the imposition of consecutive maximum sentences is arbitrary and capricious or the result of silent, improper, and unconstitutional sentencing considerations.

Although the specially concurring opinion, in discussing grossly disproportionate sentencing, suggests that there is an "evolving concept of the type of punishment that is cruel or unusual," the only recent evolution of Eighth Amendment analysis announced by the United States Supreme Court has been in the area of *juvenile* sentencing. *See Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 132 S.Ct. 2455 (2012). There has been no evolution of concept for *adult* sentencing. The last pronouncements by the Supreme Court of Eighth Amendment analysis discussing grossly disproportionate sentencing of adults are *Ewing v. California*, 538 U.S. 11 (2003) and *Lockyer v. Andrade*, 538 U.S. 63 (2003). Also, the last pronouncement on the subject by the Florida Supreme Court is *Adaway v. State*, 902 So. 2d 746 (Fla. 2005).

*Adaway* gives a good analysis of the "thicket of Eighth Amendment jurisprudence" with regards to sentencing that is alleged to be grossly disproportionate, noting that the Supreme Court itself has not reached a majority consensus on the standard for determining the constitutionality of long prison sentences. *Id.* at 748. The court also noted that "[t]he first and only case in which the [United States] Supreme Court has invalidated

a prison sentence because of its length was *Solem v. Helm*, 463 U.S. [277, 290 (1983)]." *Id.* at 749. Especially significant to this case, the court said:

> We read the decisions in *Solem*, *Harmelin* [*v. Michigan*, 501 U.S. 957 (1991)], and *Ewing* [*v. California*, 538 U.S. 11 (2003)] as requiring, for a prison sentence to constitute cruel and unusual punishment solely because of its length, that *at a minimum the sentence be grossly disproportionate to the crime.*

*Id.* at 750 (emphasis added).

What the specially concurring opinion overlooks, regarding the Eighth Amendment, is that "'proportionality analysis focuses on *the crime charged and the legislatively imposed punishment for the crime, not the specific facts of a particular case.*'" *Peters v. State*, 128 So. 3d 832, 850 (Fla. 4th DCA 2013) (emphasis added) (quoting *Edwards v. State*, 885 So. 2d 1039, 1039 (Fla. 4th DCA 2004)). Thus, the Eighth Amendment questions to be asked in this case are:[10]

(1) Is it grossly disproportional to impose a thirty-year sentence for the crime of grand theft where the value of the property taken is $20,000 or more, but less than $100,000?

(2) Is it grossly disproportional to impose a five-year sentence for the crime of theft of a motor vehicle?

In answering the above questions, "[f]irst, a court must consider the 'gravity of the offense and the harshness of the penalty.'" *Wiley v. State*, 125 So. 3d 235, 240 (Fla. 4th DCA 2013) (quoting *Andrews v. State*, 82 So. 3d 979, 984 (Fla. 1st DCA 2011)). It is hard to imagine that any judge in Florida would answer "yes" to either of the above questions. Certainly, such sentences are not "so excessive as to shock the judicial conscience." *Cf. Booker v. State*, 514 So. 2d 1079, 1085 (Fla. 1987) (explaining that it would be an abuse of discretion to impose an upward departure sentence under the 1987 sentencing guidelines if the sentence was "so excessive as to shock the judicial conscience").

---

[10] Our supreme court, following United States Supreme Court precedent, has determined that consecutive sentencing does not violate the Eighth Amendment. *Hall v. State*, 823 So. 2d 757, 761-62 (Fla. 2002).

It also appears imprudent to certify a question of great public importance in this case regarding the Eighth Amendment, because doing so ignores the separation of powers doctrine. What our supreme court stated in 1943 remains true today:

> As a general rule, in cases where the objection is to the particular sentence, and not to the statute under which it has been imposed, a sentence which is within the limit fixed by statute is not cruel and unusual and is therefore valid, no matter how harsh and severe it may appear to be in a particular case, because the constitutional prohibition has reference to the statute fixing the punishment, and not to the punishment assessed by the jury or court within the limits fixed by statute. If the statute is not in violation of the Constitution, then any punishment assessed by a court or jury within the limits fixed thereby cannot be adjudged excessive, for the reason that the power to declare what punishment may be assessed against those convicted of crime is not a judicial power, but a legislative power, controlled only by the provisions of the Constitution.

*Brown v. State*, 13 So. 2d 458, 461 (Fla. 1943); *See also O'Donnell v. State*, 326 So. 2d 4, 5 (Fla. 1975).

The precision of the analysis in support of certifying a question of great public importance with regards to the Due Process Clause is not apparent to me. Seemingly, the argument is that the maximum sentences, perceived by the majority as unduly harsh, are the result of improper sentencing considerations, rather than adhering to the sentencing principles announced by the legislature for the Criminal Punishment Code. Without explicitly determining that there is no competent substantial evidence to support the statements of the trial court at sentencing, the majority is obviously skeptical that the trial court announced its true reason for imposing the maximum sentences on an older defendant with no prior record.[11]

---

[11] As argued by the state in this case, there are significant reasons why the defendant received a much longer sentence, as compared to his younger codefendant. The state offered a plea agreement to the codefendant, which was accepted. There is an indication in the record that the defendant and codefendant were both involved with a criminal enterprise stealing boats in more than one area of the state. Although the trial court at sentencing explicitly stated it was not factoring in other crimes with which the defendant may have been involved at the time, as the state points out, nothing in this record shows what

In support of the certified question, the specially concurring opinion devotes one section to due process, consisting of four paragraphs. That section proposes a solution to our supreme court: follow the recommendation of legal commentators who have suggested that trial judges explain the reasons for the length of their sentences. What is puzzling is that the trial court in this case *did* explain on the record why it did not agree with the State's sentencing recommendation. Perhaps the majority is suggesting that trial judges should articulate reasons for the length of a sentence imposed that acknowledges consideration of, in detail or generally, the sentencing principles announced by the legislature for the Criminal Punishment Code.

An issue about which the specially concurring opinion seems concerned is silent improper sentencing considerations. By certifying a due process question to our supreme court, my assumption is the majority feels that a requirement by which trial judges articulate their reasons for imposing a sentence will allow appellate courts to discern whether silent improper sentencing factors are at play. Traveling down such a path is seriously problematic.

Similar to the discussion regarding the Eighth Amendment, adopting a due process requirement that trial judges articulate reasons for the sentence imposed, showing compliance with statutory sentencing principles, will effectively end-run section 924.06(1)(d) and (e), Florida Statutes (2015). Those sections provide:

> (1) A defendant may appeal from:
>
> . . . .
>
> (d) A sentence, on the ground that it is illegal; or
>
> (e) A sentence imposed under s. 921.0024 of the Criminal Punishment Code which exceeds the statutory maximum penalty provided in s. 775.082 for an offense at conviction, or the consecutive statutory maximums for offenses at conviction, unless otherwise provided by law.

§ 924.06(1)(d)-(e), Fla. Stat. (2015).

---

plea offers were made to the codefendant. It is not unusual for the state to offer significantly different plea offers to codefendants, in hopes one of them will "flip" on the others.

Such an end-run ignores the separation of powers doctrine. The practical outcome of such an expansion is to grant to all defendants and the appellate courts an opportunity to review the length of sentences – an opportunity which has never existed. I believe that expanded review of the length of sentences will create a tremendous influx of direct appeals and post-conviction appeals. Although appellate counsel have ethical and professional responsibilities to abstain from presenting frivolous appellate issues, I have no doubt that, in many cases, a defendant given a lengthy sentence will contend that the sentence was prompted by a silent improper sentencing consideration.

More importantly, allowing such an expanded opportunity for appellate review would be a mistake for practical reasons important to the individual case. There is sound reason for the fundamental rule of appellate decision-making that appellate courts defer to the facts, as determined by the trial judge. Trial judges operate in an environment which gives them the ability to evaluate reality, the accuracy of evidence and assertions, and the truth in ways which are not amenable to the appellate environment. Quite simply, trial judges are in a much superior vantage point to determine the appropriate *weight* of the evidence presented to them.

Additionally, imposing a due process requirement that judges announce reasons for long or disproportionate sentences which comport with statutorily approved sentencing considerations will do little to correct a problem of judges using silent, improper sentencing considerations. Any judge who is inclined to use silent, improper sentencing consideration for punishment will be able to articulate a logical reason for the improper sentence, which facially includes one of more statutorily approved sentencing considerations, for which there is competent substantial evidence in the record. Giving appellate courts the authority to review claims of silent, improper sentencing considerations because a sentence is lengthy or arguably disproportionate will authorize appeals by the many to redress a harm that I contend is experienced by far fewer defendants than the majority perceives. My fear is imposing an ineffective remedy will create more harm (the drain on judicial resources to review of meritless claims) than it cures.

By certifying a question as one of great public importance, I completely disagree with the implicit assertion, as well as some of the direct comments in the specially concurring opinion, suggesting that there is a systemic problem in the trial courts which needs correction by our supreme court. Nonetheless, even if there is a systemic problem with arguably harsh sentences, that problem is best explored, debated, and resolved by the legislature, not the judiciary.

\*       \*       \*

*Not final until disposition of timely filed motion for rehearing.*